# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
Filed: July 18, 2025

```
* * * * * * * * * * * * *
JACOB FERGUSON,                    *        PUBLISHED
                                   *
              Petitioner,          *        No. 17-1737V
                                   *
        v.                         *        Special Master Dorsey
                                   *
SECRETARY OF HEALTH                *        Damages; Pain and Suffering; Lost
AND HUMAN SERVICES,                *        Earnings Capacity; Health Insurance;
                                   *        Splenectomy; Immune Thrombocytopenia
              Respondent.          *        Purpura ("ITP").
                                   *
* * * * * * * * * * * * *
```

Richard Gage, Richard Gage, P.C., Cheyenne, WY, for Petitioner.
Ryan Daniel Pyles, U.S. Department of Justice, Washington, DC, for Respondent.

## RULING ON DAMAGES[1]

## I.    INTRODUCTION

On November 6, 2017, Jacob Ferguson[2] ("Petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program ("Vaccine Act" or "the Program"), 42

---

[1] Because this Ruling contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc in accordance with the E-Government Act of 2002.  44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services).  **This means the Ruling will be available to anyone with access to the Internet.**  In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy.  If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

[2] The petition was initially filed by April Ferguson ("Ms. Ferguson") on behalf of her then minor son, Jacob Ferguson; however, he reached the age of majority during the pendency of this case, and the case caption was amended.  Order dated July 18, 2022 (ECF No. 110).

U.S.C. § 300aa-10 et seq. (2018).[3]  Petitioner alleged he suffered from immune thrombocytopenia purpura ("ITP")[4] as the result of a tetanus-diphtheria-acellular pertussis ("Tdap")[5] and meningococcal conjugate vaccinations administered on October 23, 2014.  Petition at ¶¶ 1, 5-6 (ECF No. 1).  On December 10, 2021, the undersigned issued a Ruling on Entitlement, finding Petitioner was entitled to compensation.  Ruling on Entitlement dated Dec. 10, 2021 (ECF No. 78); see also Ferguson v. Sec'y of Health & Hum. Servs., No. 17-1737V, 2021 WL 6276204 (Fed. Cl.  Spec. Mstr. Dec. 10, 2021).

Since that ruling, the parties have been in the damages phase of litigation but have been unable to resolve certain items of damages.  The parties submitted briefs on the issues of pain and suffering, lost wages, and the life care plan, and the undersigned held a damages hearing on the issue of the effect of Petitioner's illness on his ability to work, his prognosis, and the risk of complications due to his splenectomy.

After consideration of all the evidence and for the reasons described below, the undersigned finds that Petitioner has proved by preponderant evidence that he is entitled to an award of $250,000.00 for pain and suffering, and regarding the life care plan, the undersigned finds Petitioner is entitled to health insurance coverage.  Lastly, the undersigned finds Petitioner has not proved by preponderant evidence that he is entitled to an award of lost wages.

## II.    PROCEDURAL HISTORY

Petitioner filed his petition on November 6, 2017.  Petition.  The early procedural history from November 2017 through 2021 was set forth in the undersigned's Ruling on Entitlement and will not be repeated here.  See Ruling on Entitlement at 3-5.

On December 10, 2021, the undersigned issued a Ruling on Entitlement, finding that Petitioner was entitled to compensation.  Ruling on Entitlement at 2, 34.  Thereafter, the parties engaged in damages discussions but were not able to resolve pain and suffering and lost earnings and on July 20, 2023 requested a briefing schedule on these issues.  Joint Status Rept., filed July 20, 2023 (ECF No. 136).  On November 1, 2023, the parties reported that they were unable to

---

[3] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-10 to -34 (2018).  All citations in this Ruling to individual sections of the Vaccine Act are to 42 U.S.C. § 300aa.

[4] Throughout the medical records, Petitioner's treating physicians refer to his condition as idiopathic thrombocytopenia purpura and immune thrombocytopenia purpura.  The undersigned will refer to both as ITP throughout this Ruling.

[5] Although the petition alleged Petitioner received a diphtheria-tetanus-acellular-pertussis ("DTaP") vaccination, the medical records indicate Petitioner received a Tdap vaccination on October 23, 2014.  Petitioner's Exhibit ("Pet. Ex.") 2 at 1.

resolve the disputed life care items and requested a briefing schedule on this issue as well.  Pet. Status Rept., filed Nov. 1, 2023 (ECF No. 155).

Between August 2023 and March 2024, the parties briefed the disputed issues.  Petitioner filed briefs in support of pain and suffering, lost wages, and life care plan items.  Pet. Memorandum on Pain and Suffering Award ("Pet. Pain and Suffering Memo."), filed Aug. 28, 2023 (ECF No. 143); Pet. Loss of Earning Memo. ("Pet. Lost Wages Memo."), filed Sept. 15, 2023 (ECF No. 148); Pet. Memo. on Life Care Plan Items ("Pet. LCP Memo."), filed Dec. 8, 2023 (ECF No. 159).  Respondent filed responsive briefs.  Respondent's Brief on Damages ("Resp. Br."), filed Oct. 11, 2023 (ECF No. 164); Resp. Br. on Life Care Plan Damages ("Resp. LCP Br."), filed Jan. 11, 2024 (ECF No. 164).  Petitioner filed reply briefs on the issues of pain and suffering and life care plan items.  Pet. Reply to Resp. Br. ("Pet. Lost Wages Reply"), filed Nov. 1, 2023 (ECF No. 156); Pet. Reply to Resp. LCP Br. ("Pet. LCP Reply"), filed Mar. 14, 2024 (ECF No. 176).

Throughout litigation on damages, Petitioner filed various records, including updated medical records, expert reports, life care plans, and an affidavit, and Respondent filed expert reports and life care plans.  Pet. Exs. 34, 64-66, 70-74, 77, 79; Resp. Exs. C-H.

After briefing was completed, Petitioner requested a hearing on the issue of lost wages. Order dated Mar. 15, 2024 at 1.  The undersigned set a hearing for August 28, 2024 to elicit testimony from the expert physicians on the effect of Petitioner's illness on his ability to work, his prognosis, and risks of complications due to his splenectomy.  Order dated May 7, 2024, at 1 (ECF No. 186).

Petitioner's expert, Dr. Edwin N. Forman, and Respondent's expert, Dr. John J. Strouse, testified at the damages hearing held on August 28, 2024.  Tr. 5-76.

At the post-hearing status conference, the undersigned informed the parties that she would be awarding health insurance based on the testimony of Dr. Forman and Dr. Strouse. Order dated Sept. 5, 2024 (ECF No. 192).  She directed the parties to file an updated consolidated life care plan.  Id.  The parties confirmed that no post-hearing briefing was required. Id.

The parties did not file an updated consolidated life care plan because they were unable to reach an agreement on an appropriate insurance plan for Petitioner.  See Pet. Status Rept., filed Nov. 7, 2024 (ECF No. 197).  Instead, the parties proposed filing individual insurance plan proposals for the undersigned's consideration.  Id.  Subsequently, the parties filed their proposed health insurance plans and credit ratings, and Respondent filed the proposed health insurance plans with Affordable Care Act ("ACA") subsidy offsets.  Pet. Exs. 81-82, Resp. Ex. I.  On January 10, 2025, Petitioner filed a status report stating the parties were unable to agree on an insurance plan and confirming the case was ready for damages adjudication.  Pet. Status Rept., filed Jan. 10, 2025 (ECF No. 204).

### III.    FACTUAL HISTORY

#### A.    Medical Record History[6]

##### 1.    Pre-Vaccination

Prior to the vaccinations at issue, Petitioner had a medical history that included a heart murmur diagnosed at birth, asthma, pharyngitis, strep throat, impetigo, concussion, and constipation.  Pet. Ex. 1 at 2, 4, 9-10, 12-13, 16, 19, 37.  On October 23, 2014, Petitioner received Tdap, meningococcal conjugate, and flu vaccinations.  Id. at 20; Pet. Ex. 2 at 1.  Physical examination by Mary Pascolini, Certified Nurse Practitioner ("CNP"), was normal.  Id. at 22.  No bruising or other signs of a low platelet count were reported or noted during the physical examination at this visit.  Id.

##### 2.    Post-Vaccination Through Splenectomy

On January 29, 2015, Petitioner saw Dr. Louis Brine at Akron Children's Hospital ("ACH") for a rash.  Pet. Ex. 1 at 25.  Ms. Ferguson reported Petitioner's rash had been present on the right side of his scalp for one week.  Id. at 26.  The onset was acute and the course was unchanging.  Id.  The rash was described as crusty, red, and bumpy.  Id.  He did not have a fever, cough, ear pain, headache, vomiting, or diarrhea.  Id.  Ms. Ferguson also stated she was concerned with Petitioner's bruising, and reported that he was currently wrestling in school.  Id.  Dr. Brine's physical examination revealed a raised, red, scabbed lesion on the right side of Petitioner's scalp without discharge.  Id.  He diagnosed Petitioner with impetigo and bruising.  Id. at 25-26.  He was prescribed mupirocin calcium and clindamycin for impetigo, and a complete blood count ("CBC") with differential was ordered due to his bruising.  Id.  CBC results revealed a low platelet level of 10 (low panic; range 200-450).[7]  Id. at 141.

Later that day, Petitioner returned to ACH for bilateral bruising to his legs and thrombocytopenia.  Pet. Ex. 1 at 26-27.  Admission to ACH was recommended after Petitioner's blood work revealed a platelet count of 10 (low panic).  Id. at 27, 29.  His parents reported an episode of epistaxis on January 25 that resolved in less than ten minutes.  Id. at 27.  He had regular, daily, non-bloody bowel movements.  Id.  Julia R. Golden, CNP, performed a physical examination that revealed petechiae to the tongue and "several healing impetigo lesions noted

---

[6] The summary of the medical records in largely taken from the undersigned's Ruling on Entitlement.  Ruling on Entitlement at 5-15.  The undersigned has also reviewed and summarized supplemental medical records.  Pet. Exs. 64, 70, 79.

[7] Petitioner's platelet counts in his medical records range from 5 to 710 x 10⁹/L (liter of blood).  According to Petitioner's early medical records, a normal count ranges from 200 to 450 x 10⁹/L.  Pet. Ex. 1 at 141.  Later medical records provide a normal count range of 150 to 450 x 10⁹/L.  See, e.g., Pet. Ex. 79 at 9.  Respondent and the parties' experts refer to Petitioner's platelet levels using a different measurement unit than is used in his medical records.  For simplicity, throughout this Ruling, the measurement unit for platelet counts used in the medical records will be referenced.

[on] right forehead, right upper cheek and scalp, not open, no drainage noted.  Bruise to forehead.  Scattered bruising [on] bilateral legs with multiple bruises ~ 2cm in diameter."  Id. at 28.  Ms. Golden's impression was "post viral thrombocytopenia with a likely diagnosis of acute [ITP]."  Id. at 29.  Petitioner was admitted, and intravenous immune globulin ("IVIG")[8] was ordered.  Id.

On January 31, 2015, Petitioner was seen by hematologist, Dr. Daniel F. Pettee.  Pet. Ex. 1 at 30.  Dr. Pettee noted Petitioner's "[p]arents also admit[ted] to petechiae on cheeks over the weekend that resolved."  Id.  Petitioner's platelet count after his first dose of IVIG was 6 (low panic).  Id. at 30, 144.  He received his second dose of IVIG overnight.  Id. at 30.  Overnight, he had a headache, nausea, and emesis.  Id. at 30, 34.  He also "developed rigors that resolved with Demerol and slowing infusion rate."  Id. at 30.

Dr. Pettee's physical examination revealed "several healing impetigo lesions noted [on] right forehead and scalp, crusted, no active drainage.  Scattered bruising to bilateral legs with multiple bruises ~ 2cm in diameter, but fading.  No petechiae."  Pet. Ex. 1 at 31.  He had no oral bleeding.  Id. at 34.  Petitioner's platelet count increased to 22 (low panic).  Id. at 34, 144.  Dr. Pettee's impression was ITP.  Id. at 34.  Petitioner was ordered to follow up in one week for blood work and one month for examination.  Id.  He was prescribed Zofran, and ordered to refrain from wrestling, contact sports, and gym class.  Id. at 33-34.  He was discharged home. Id.

Blood work from February 5, 2015 showed a platelet count of 19 (low panic).  Pet. Ex. 1 at 145.  On February 9, 2015, Petitioner's platelets were 16 (low panic).  Id.

Petitioner returned to ACH on February 11, 2015 for new bruising and platelet count of 11 (low panic).  Pet. Ex. 1 at 36-37, 145.  Ms. Ferguson reported Petitioner had "developed four new bruises when he woke up this morning on his right leg, right thigh, right arm, and on the bridge of his nose (from a breathe right strip)" and "a few petechiae in his right axilla a few days ago as well which have not progressed."  Id. at 37.  Ms. Ferguson and Petitioner denied "hematochezia,[9] hematemesis,[10] bleeding from the gums, or hematuria,[11]" but noted

---

[8] IVIG is "used in the treatment of primary immunodeficiency disorders and [ITP]."  Immune Globulin Intravenous (Human), Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=78975 (last visited June 13, 2025).

[9] Hematochezia is the "presence of blood in the feces."  Hematochezia, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=21736 (last visited June 13, 2025).

[10] Hematemesis is the "vomiting of blood."  Hematemesis, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=21717 (last visited June 13, 2025).

[11] Hematuria is "blood (erythrocytes) in the urine."  Hematuria, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=21814 (last visited June 13, 2025).

Petitioner had "epistaxis from his left nare [four] days ago that lasted a few minutes." Id. Ms. Ferguson reported that Petitioner had an upper respiratory infection over the past few days. Id. He had not had a fever, but "complain[ed] of clear-yellow rhinorrhea and nasal congestion which is improving. He denie[d] cough, headaches, throat pain, chest pain, abdominal pain, change in bowel habits, diarrhea, constipation, muscle pain or joint pain or swelling." Id. He also reported no fatigue and a normal appetite, and "denie[d] any rough housing and . . . wrestling." Id.

Hematologist Dr. John F. Fargo noted a CBC done that day revealed a platelet count of 11 (low panic). Pet. Ex. 1 at 37, 145. Physical examination revealed no petechiae in throat and "bilateral cervical lymphadenopathy." Id. at 38. Dr. Fargo's skin examination showed "[s]cattered bruising [] on right pre-tibial area, right upper outer thigh, extensor surface of right forearm, [and] extensor surface of left upper arm ranging from 1.5cm - 2.5cm;" a "[s]mall bruise [] on bridge of nose;" and "3 petechia in left armpit as well as 5-10 single, scattered petechiae [] on arms and legs." Id. at 39. Impression was ITP. Id. Petitioner was admitted and given WinRho.[12] Id. at 39-40. CBC on February 12, 2015 revealed a "stable" platelet level of 12 (low panic). Id. at 41, 147. He was discharged. Id. at 40-41. His discharge diagnosis was thrombocytopenia and ITP. Id. Discharge orders directed Petitioner to "[a]void any situation or activity where [he] could get bruised or hit. Absolutely NO contact sports." Id. at 42.

Blood work taken on February 16, 2015 showed platelets of 30 (low panic). Pet. Ex. 1 at 147. On February 24, 2015, Petitioner's platelets were 32 (low panic). Id. at 148.

On March 3, 2015, Petitioner returned to ACH for a follow-up examination with Dr. Pettee. Pet. Ex. 1 at 43. He had "some residual bruising/petechiae in small amount but no other bleeding i.e. [n]osebleeds, mouth bleeding." Id. at 44. Petitioner also had no fever, and his energy and appetite had improved. Id. Dr. Pettee's physical examination revealed a "[s]mall 1 cm healing bruise [on Petitioner's] left forearm" and "[f]ew petechiae [on] left supraclavicular area and right axilla." Id. CBC showed a platelet count of 27 (low panic). Id. at 45, 148. Petitioner's diagnosis remained ITP. Id. at 45. Dr. Pettee noted Petitioner's "[p]latelet count [was] stable/slightly decreased though he is doing clinically well." Id. Dr. Pettee planned to continue monitoring platelet counts monthly, and have Petitioner follow up in four months with the hope that his ITP would be resolved by then. Id. Petitioner was ordered to continue to avoid anti-inflammatories and be cautious regarding high risk activities, such as contact sports, skateboarding, snow mobiles, and ATVs, although he was permitted to participate in gym. Id. at 45-46.

CBC on March 27, 2015 showed that platelets were 20 (low panic). Pet. Ex. 1 at 149. On April 6, 2015, Petitioner had a platelet count of 27 (low panic). Id. at 150. On April 20, 2015, his platelets decreased to 23 (low panic). Id. His platelets were 34 (low panic) on May 4, 2015. Id. at 151.

---

[12] WinRho is a $Rh_0(D)$ immune globulin "used as a platelet count stimulator in the treatment of [ITP]." WinRho, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/ dorland/definition?id=53699 (last visited June 13, 2025); $Rh_0(D)$ Immune Globulin, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=78981 (last visited June 13, 2025).

Petitioner presented to the emergency department ("ED") at ACH for right ear pain for one to two days on May 12, 2015. Pet. Ex. 1 at 46. Dr. Jeffrey Jinks conducted a physical examination that revealed no petechiae, purpura, or rash. Id. at 47. Dr. Jinks' diagnosis was eustachian tube dysfunction. Id. On June 1, 2015, Petitioner's platelets remained at a low panic level of 25. Id. at 151. On June 7, 2015, Petitioner returned to the ED at ACH for a sore throat for at least one week. Id. at 48. Dr. Michael A. Billow's physical examination did not reveal bruising or petechiae. Id. at 49. Petitioner was diagnosed with pharyngitis/croup. Id.

On June 10, 2015, Petitioner presented to Dr. Jinks at the ACH ED for a "rash on trunk starting today." Pet. Ex. 1 at 49-50. Physical examination revealed rash, but no petechiae or purpura. Id. at 51. Dr. Jinks described the rash as red and pimply on his back and upper chest, some of which was with whiteheads. Id. Dr. Jinks diagnosed Petitioner with folliculitis and prescribed Augmentin. Id.

Petitioner returned to ACH complaining of leg pain for one month on June 18, 2015. Pet. Ex. 1 at 51, 53. Dayne M. Adkins, CNP, conducted a physical examination and found no petechiae or purpura. Id. at 53. His platelets remained low at 54 on June 29, 2015. Id. at 152.

On July 14, 2015, Petitioner followed up with Dr. Pettee for his ITP. Pet. Ex. 1 at 54. He reported "feeling well" with "no significant bleeding." Id. at 55. Petitioner "[was] having normal bruises with play or minor injury and no spontaneous bruising in other places. He report[ed] for the last 2-3 months he has had pain in [bilateral] thighs, lower legs, and ankles that [was] worse in AM, improves with [T]ylenol, and [was] slowly getting better." Id. Petitioner had no back pain, weight loss, or significant fatigue. Id. He was "playing actively and running long distances (up to [two] miles)." Id. Dr. Pettee's physical examination found a "2.5 cm bruise inside of left leg" and a "few small 1 cm bruises scattered on [bilateral] lower extremities." Id. at 56. Blood work revealed a platelet count of 47 (low panic). Id. at 56, 152. Diagnosis remained ITP. Id. at 57. Dr. Pettee noted Petitioner's platelet count was "stable and historically higher than previous [three] months," and he opined Petitioner's "ITP should resolve on its own and will need [two] consecutive normal counts to consider it completely resolved." Id. He planned to recheck blood work in three months, and ordered Petitioner to continue to avoid high risk activities and anti-inflammatories, although he was permitted to participate in non-contact activities. Id.

On September 30, 2015, Petitioner's platelet count was 32 (low panic). Pet. Ex. 1 at 152. His platelets increased to 45 (low panic) on October 16, 2015. Id. at 153.

On October 26, 2015, Petitioner presented to Dr. Erin M. Donley at ACH for his annual well-child examination. Pet. Ex. 1 at 57. Dr. Donley's physical examination was normal. Id. at 59-60. At this visit, Petitioner received a flu vaccine and his first human papillomavirus ("HPV") vaccine. Id. at 58; Pet. Ex. 2 at 1. On November 27, 2015, blood work revealed a platelet count of 37 (low panic). Pet. Ex. 1 at 153.

Petitioner returned to Dr. Pettee for an ITP follow-up examination on January 20, 2016. Pet. Ex. 1 at 60. Petitioner "[was] at the 12 month mark from ITP diagnosis with no current

evidence of bleeding." Id. at 62. Petitioner was still not wrestling due to a platelet count under 50 on his prior CBC. Id. On physical examination, no significant bruising was found. Id. at 62-63. Bloodwork showed a platelet count of 55 (low). Id. at 63, 154. Petitioner's diagnosis remained ITP. Id. at 64. Dr. Pettee wrote, "[g]iven [Petitioner] is now 12 months from diagnosis [and] ITP [] has not resolved, a bone marrow [biopsy] is indicated to rule out ongoing myelodysplasia." Id. Further immune work up was also pending. Id. Dr. Pettee permitted Petitioner to participate in gym if his parents desired. Id.

Petitioner's immune work up results were completed on January 22, 2016. Pet. Ex. 1 at 154. His Immunoglobulin G, A, and M levels were all normal, but he tested positive for antinuclear antibodies ("ANA").[13] Id. at 154, 156.

On February 2, 2016, a bone marrow biopsy and aspiration was conducted by Dr. Pettee. Pet. Ex. 1 at 64-65, 218. Petitioner was sedated for the procedure. Id. Pathologist Dr. Mark A. Steele's final diagnosis was "[n]ormocellular to hypercellular bone marrow with megakaryocytic hyperplasia." Id. at 162. Dr. Steele commented that "[t]he finding of megakaryocytic hyperplasia does not suggest a platelet production problem and suggests that [Petitioner's] thrombocytopenia is due to peripheral platelet destruction, consumption, or sequestration." Id. Diagnosis remained ITP. Id. at 218.

During physical examination on February 2, Dr. Pettee noted no significant bruising. Pet. Ex. 1 at 67-68. Bloodwork revealed a platelet count of 56 (low), and positive ANA with a titer of 1:320, speckled. Id. at 68, 156. Dr. Pettee referred Petitioner to Dr. Mary Toth in rheumatology to get her opinion regarding his positive ANA. Id. at 69.

Petitioner saw Dr. Toth on March 3, 2016 for a consultation regarding his positive ANA. Pet. Ex. 1 at 69. Physical examination was normal. Id. at 72. Dr. Toth "explained that 5% of healthy children can have a positive ANA without risk or present autoimmune disease. Diagnosis of the conditions associated with a positive ANA are made based on clinical diagnosis in addition to the laboratory testing." Id. at 74. Her diagnosis was ANA positive and ITP. Id. She recommended more testing, including CBC, urinalysis, and comprehensive metabolic panel, and if they were normal, further work up or evaluation would not be necessary. Id. Testing ordered by Dr. Toth revealed a platelet count of 76 (low), normal urinalysis, and positive ANA with titer of 1:640. Id. at 163-68. The additional testing ordered by Dr. Toth was normal.[14] See id.

---

[13] Antinuclear antibodies ("ANA") are "antibodies directed against nuclear antigens; ones against a variety of different antigens are almost invariably found in systemic lupus erythematosus and are frequently found in rheumatoid arthritis, scleroderma (systemic sclerosis), Sjögren syndrome, and mixed connective tissue disease." Antinuclear Antibodies, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=56804 (last visited June 13, 2025).

[14] Urinalysis was normal. Pet. Ex. 1 at 165. Metabolic panel was normal. Id. at 166-67. Immunoglobulins G and M Cardiolipin antibody blood tests were negative. Id. at 167. Beta-2 Glycoprotein antibodies were negative. Id. DRVVT screening was within normal limits. Id. at 168. Strep A antigens were not detected. Id. Throat swab strep culture was negative. Id.

On June 1, 2016, Petitioner presented to Dr. Pettee for follow-up. Pet. Ex. 1 at 76. He reported bruising on bilateral knees, thighs, and left forearm from baseball. Id. at 77-78. He was not having any spontaneous bleeding and his leg pain reported during prior visits was gone. Id. at 78. On physical examination, Dr. Pettee noted "[m]ultiple small 1 cm bruises [bilateral] knees. 1-2 small 2 cm fading bruises on right thigh. Few small [] bruises on left forearm. No petechiae." Id. Petitioner's platelet count was 40 (low panic). Id. at 169. Dr. Pettee's diagnosis was chronic ITP. Id. at 79. He noted Petitioner "[was] doing well with no spontaneous bruising." Id. Because his platelets were 40, treatment was not needed. Id. Petitioner was advised he could "resume a normal lifestyle" and Petitioner's only restrictions were to avoid contact sports and anti-inflammatories. Id. Petitioner was ordered to follow up in six months for labs and examination. Id. Additional blood work taken on June 30, 2016 showed a low platelet count of 37 (low panic). Id. at 170.

Petitioner returned to the ED at ACH on July 5, 2016 for a left leg injury. Pet. Ex. 1 at 80. While playing baseball, Petitioner was hit on the leg by the ball. Id. His primary care physicians recommended an X-ray if the pain continued. Id. Physical examination conducted by Dr. Michael A. Billow found "[c]ircular bruising to left medial lower leg over mid tibia with mild edema. Tenderness to palpation over bru[i]sing. Pulses, sensation, and strength intact distal to injury." Id. at 81. Discharge diagnosis was contusion to left lower leg. Id. at 82.

On October 28, 2016, Petitioner's platelet level was 33 (low panic). Pet. Ex. 1 at 171.

Petitioner had his 12-year well-child examination with Dr. Jacqueline Lickliter on November 4, 2016. Pet. Ex. 1 at 82. Physical examination was normal. Id. at 85. Petitioner was cleared for basketball. Id. at 83. He received his second HPV vaccination and a flu vaccination at this visit. Id.

Petitioner followed up for his ITP on December 5, 2016 with Dr. Stephanie Savelli. Pet. Ex. 1 at 87. He reported he was playing basketball, had experienced bruising generally related to trauma, and had "one episode of epistaxis after being hit on the nose which lasted only [five] minutes." Id. at 88. Petitioner "denie[d] petechiae, hematuria, blood in his stool[,] and oral mucosal bleeding except for some bleeding from a loose tooth when brushing his teeth." Id. Physical examination noted "[n]o significant bruises, rashes, petechiae[,] or jaundice," as well as "some fading bruises on his bilateral elbows and a fading bruise on his distal shin on the [right lower extremity]." Id. at 89. Blood work taken that day revealed a platelet count of 60 (low). Id. at 89, 172. His diagnosis remained chronic ITP. Id. at 90. Petitioner was "reassured that he can resume a normal lifestyle" with the only restriction to avoid contact sports. Id. Dr. Savelli discussed other treatment options, but "[did] not recommend any treatment if [asymptomatic] and platelet number in a range to allow him to participate in desired activities." Id. Petitioner was ordered to follow up in six months for labs and examination. Id.

On April 5, 2017, Petitioner saw Dr. Pettee for new bleeding, bruising, and petechiae. Pet. Ex. 1 at 96-97. Petitioner indicated "[h]e has had bruising since Monday, mostly on his legs. Since this AM he has developed petechiae on his neck." Id. at 97. Physical examination noted, "Large 4 cm hematoma left shin. Multiple other large bruises in various stages of healing on

arms, legs.  6 x 6 cm patch of petechiae on right lower neck." Id. at 98.  Blood work from April 3, 2017 revealed a platelet count of 16 (low panic).  Id. at 173.  On April 5, 2017, platelet count was 14 (low panic).  Id. at 98, 174.  Dr. Pettee started Petitioner on dexamethasone[15] pulses for four days, repeating monthly for three months.  Id. at 99.  He ordered repeat blood work in five days, and Petitioner was instructed to follow up in one month for a re-evaluation.  Id.  Blood work from April 10, 2017 showed improved platelets of 93 (low).  Id. at 175.

Petitioner returned to Dr. Pettee on May 15, 2017.  Pet. Ex. 1 at 99.  Physical examination revealed a 4-5 cm bruise on his right knee, a 3-4 cm bruise on his left knee, and no petechiae.  Id. at 101-02.  He had a platelet level of 17 (low panic).  Id. at 102, 176.  Diagnosis remained chronic ITP.  Id. at 102-03.  Dr. Pettee ordered Petitioner to start his next dexamethasone treatment for four days, and follow up in one month.  Id. at 103.

On June 21, 2017, Petitioner returned to Dr. Pettee for a follow up.  Pet. Ex. 1 at 103.  He reported "[b]ruising recurred after [one] week post [dexamethasone] and has been bruising ever since." Id. at 105.  Physical examination noted "[d]iffuse upper and lower extremity [bruises] 1-4 cm in size in various stages of healing with patches of petechiae on arms, trunk from minor abrasions." Id.  Platelet levels were 14 (low panic).  Id. at 105, 177.  Dr. Pettee noted Petitioner "tolerated" dexamethasone but complained of stomach aches, facial puffiness, tiredness, and being "unable to sleep well." Id. at 105.  Dr. Pettee opined that Petitioner was "somewhat steroid resistant" and diagnosed him with steroid side effects along with chronic ITP.  Id. at 106.  Dr. Pettee had Petitioner begin his next dexamethasone pulse and started him on eltrombopag[16] daily.  Id.  He was ordered to follow up in two weeks.  Id.

Petitioner's July 7, 2017 CBC showed low platelets of 34.  Pet. Ex. 1 at 178-79.  On July 11, 2017, platelets were 9 (low panic).  Id. at 180-81.  On July 25, 2017, his platelets were at 18 (low panic).  Id. at 182.  Petitioner's next CBC done on August 22, 2017 showed platelets at 5 (low panic).  By August 31, 2017, his platelets increased, but remained low at 81.  Id. at 112, 185.

On September 1, 2017, Petitioner saw Dr. Kathryn Phillippi Cook, a rheumatologist, on referral from Dr. Pettee.  Pet. Ex. 1 at 108.  She noted Petitioner had been treated with steroids, IVIG, WinRho, and eltrombopag, but his platelets still remained low.  Id. at 109.  Dr. Cook noted that Petitioner was currently receiving dexamethasone with IVIG.  Id.  "Given that [Petitioner's] platelets have been resistant to the treatments, Dr. Pettee wanted [Petitioner] to be seen again by rheumatology as their next option is for splenectomy." Id.  Petitioner "denie[d] any spontaneous bleeding, alopecia, mouth/nose sores, chest pain, trouble breathing, abdominal pain, nausea,

---

[15] Dexamethasone is "an anti-inflammatory and immunosuppressant in a wide variety of disorders." Dexamethasone, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=13599 (last visited June 13, 2025).

[16] Eltrombopag olamine "stimulates platelet production" and is "used for the treatment of thrombocytopenia in patients with chronic [ITP] who have had an insufficient response to other treatments." Eltrombopag Olamine, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=15982 (last visited June 13, 2025).

vomiting, diarrhea, blood in his stool or urine, rashes, morning stiffness, joint pain, swelling, erythema[,] or increased warmth." Id. Physical examination revealed "[m]ultiple bruises on his upper and lower extremities" and a "[h]ealing scar on his right shin." Id. at 112. She noted Petitioner was "currently not playing any sports because of his thrombocytopenia." Id. at 109. Diagnosis was ITP and a positive ANA. Id. at 113. Dr. Phillippi Cook wrote that although different conditions, diseases, infections, and drugs can be associated with a positive ANA, "[a] low titer ANA can be found in 5-10% of individuals without evidence of connective tissue disease. This makes it difficult to use ANA alone to rule in or rule out any particular disease." Id. She opined that Petitioner did not exhibit findings to suggest an associated rheumatic disease, but given his persistent ITP, additional labs were ordered. Id. She suggested that if the labs were normal, other than the positive ANA, it "might be worth consider[ing] rituximab[17] for his refractory ITP prior to doing a splenectomy." Id. at 113-14.

Subsequent lab work conducted in September 2017 revealed a positive ANA with a titer of 1:640, along with low platelets. Pet. Ex. 1 at 185-94, 198. Throughout September, Petitioner's platelet levels fluctuated between 12 and 18 (low panic), until September 29, 2017, when his platelets increased to 45 (low panic). Id. Petitioner received a pneumococcal vaccine on September 25, 2017. Pet. Ex. 10 at 3.

Petitioner had a pediatric surgery consult with Dr. Oliver Soldes at ACH on October 1, 2017. Pet. Ex. 1 at 114. Past medical history noted multiple hospitalizations for "diagnosis and IVIG infusion." Id. at 118. Dr. Soldes agreed that a laparoscopic splenectomy was indicated. Id. at 117. Petitioner presented for his pre-operative consultation on October 4, 2017. Id. Physical examination by Lindsay Schroeter, CNP, was normal. Id. at 120-21. Surgery was ordered to be scheduled. Id. at 123.

October 6, 2017 blood work revealed Petitioner's platelets were 151 (normal). Pet. Ex. 1 at 199. One week later, on October 13, 2017, his platelets had decreased to 75 (low). Id. at 200. The following week, on October 20, 2017, his platelets further decreased to 28 (low panic). Id. at 201. Petitioner received a flu vaccine on October 20, 2017. Pet. Ex. 10 at 3. On October 23, 2017, his blood work was normal, including his platelet level of 210. Pet. Ex. 1 at 202.

### 3. Splenectomy and Post-Splenectomy

Dr. Soldes conducted a laparoscopic splenectomy without complications on October 25, 2017. Pet. Ex. 1 at 124. After surgery, Petitioner did well and had no bleeding. Id. at 129. The day following surgery, October 26, 2017, his platelets were 249 (normal). Id. at 203. ITP steroid treatment was discontinued, and Petitioner was ordered to start penicillin VK for pneumococcal prophylaxis. Id. at 129. Petitioner was discharged home on October 28, 2017. Id.

---

[17] Rituximab is "a chimeric murine/human monoclonal antibody that binds the CD 20 antigen; used as an antineoplastic in the treatment of CD20-positive, B-cell non-Hodgkin lymphoma; administered intravenously." Rituximab, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=43977 (last visited June 13, 2025).

Petitioner's CBC on November 8, 2017 revealed a platelet level of 710 (high).  Pet. Ex. 1 at 204.  The following week, on November 15, 2017, his platelets were 495 (high).  Id. at 205.

On November 27, 2017, Petitioner saw to Dr. Pettee for a follow up.  Pet. Ex. 1 at 134.  Petitioner reported "[b]ruising on legs with mild injuries," but "[n]o fresh petechiae or other bruising."  Id. at 135.  He was "feeling much better since his splenectomy."  Id. at 136.  Dr. Pettee noted that Petitioner was "tolerating his [penicillin] twice daily well."  Id.  Physical examination found no petechiae and a few faded bruises on Petitioner's bilateral shins.  Id.  Blood work that day revealed a platelet count of 466 (high).  Id. at 136, 205.  Dr. Pettee "recommend[ed] [Petitioner] follow up with Dr. Soldes for post[-]operative care and clearance for sports, but from [his] perspective [Petitioner] [was] clear to resume contact sports as his platelets [were] normal."  Id. at 137.  Dr. Pettee discussed with Petitioner and Ms. Ferguson "that [Petitioner's] chronic ITP may still be present but if [he] maintains normal platelets[,] [there are] no active concerns."  Id.  Dr. Pettee also discussed "fever precautions" and Petitioner's risk for invasive pneumococcal disease.  Id. at 137.  Dr. Pettee informed Petitioner that he "will need to be admitted to hospital for 24-48 hours for sepsis evaluation for ANY fever 101 or higher.  [Ms. Ferguson and Petitioner] both understood and agreed to plan.  He will also need re-vaccination for pneumococcus per NIH vaccine guidelines."  Id.

Petitioner saw Dr. Soldes on December 4, 2017 for a post-operative visit.  Pet. Ex. 1 at 138.  He was doing well following surgery with an excellent platelet response.  Id. at 139.

Petitioner returned to Dr. Pettee on January 15, 2018.  Pet. Ex. 7 at 3.  He reported no bruising or petechiae.  Id.  Physical examination was normal.  Id. at 4-5.  Blood work revealed a platelet level of 376 (normal).  Id. at 5.  Dr. Pettee ordered Petitioner to follow up in one year.  Id. at 6.  On January 29, 2018, during a visiting to ACH for unrelated complaints, Ms. Ferguson noted Petitioner had begun wrestling again.  Id. at 6-7.  Physical examination noted no bruising or petechiae.  Id. at 7.  Petitioner was again advised of post-splenectomy fever precautions and directed to continue his prophylactic penicillin.  Id. at 6.

Throughout 2018, Petitioner presented to ACH for unrelated complaints, including pharyngitis, facial injury,[18] and pectus carinatum.[19]  Pet. Ex. 7 at 8-14.  Physical examinations at these visits did not note any bruising or petechiae.  Id. at 9-11, 13.

Petitioner presented to Dr. Lickliter for his 14-year annual visit on November 28, 2018.  Pet. Ex. 10 at 1.  Physical examination did not reveal bruising or petechiae.  Id. at 12.

Petitioner presented to the ACH ED complaining of eye redness, sore throat, cough, and runny nose on December 7, 2018.  Pet. Ex. 10 at 21, 23.  Physical examination did not show

---

[18] Petitioner did complain of nosebleeds due to the facial injury, but "[d]enie[d] epistaxis between nasal injury."  Pet. Ex. 7 at 9, 11.

[19] Pectus carinatum is "a group of deformities of the anterior chest wall characterized by convex protrusion of the sternum and of the costal cartilages on one or both sides."  Pectus Carinatum Olamine, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/ definition?id=96922 (last visited June 13, 2025).

"rashes, petechiae[,] or bruising." Id. at 25.  He was discharged home with a diagnosis of unspecified conjunctivitis and unspecified acute upper respiratory infection.  Id. at 21, 26.

He returned to the Dr. Pettee on January 2, 2019 for a follow-up examination.  Pet. Ex. 10 at 45.  Petitioner reported "[n]o bleeding, bruising, or petechial rashes."  Id. at 47.  Physical examination was normal.  Id.  Blood work taken that day revealed a normal platelet level of 341.  Id. at 47, 51.  He received a flu vaccine at this visit.  Id. at 3, 50, 52.  His diagnosis remained chronic ITP.  Id. at 48.  Dr. Pettee reported Petitioner was doing well and ordered him to follow up in one year.  Id.

Petitioner followed up with Dr. Pettee next on January 3, 2020.  Pet. Ex. 10 at 87.  He was doing well with no bleeding or bruising.  Id. at 88-89.  He was participating in wrestling.  Id. at 89.  Dr. Pettee noted that Petitioner was "[t]hinking about his future options (electrician vs college)."  Id.  Physical examination revealed "[n]o rash, bruising, or petechiae."  Id.  Petitioner's platelet levels were normal at 271.  Id. at 89, 91.  Petitioner received a flu vaccine at this visit.  Id. at 3, 90, 93.  Petitioner was advised to monitor for fever above 101 as he would "need ED evaluation, blood culture, and IV ceftriaxone for any fever due to his splenectomized state."  Id. at 90.  Petitioner was directed to continue his penicillin regime.  Id.  Dr. Pettee directed him to follow up in one year.  Id.

On January 17, 2020, Petitioner presented to the Mahoning Valley ED for a right hand injury during a wrestling match.  Pet. Ex. 10 at 109, 111.  He was diagnosed with a displaced fracture of shaft of fifth metacarpal bone in right hand.  Id. at 107, 115.  Physical examination did not reveal any bruising or petechiae.  Id. at 113.

On January 25, 2021, Petitioner saw Dr. Pettee for a follow-up examination.  Pet. Ex. 10 at 140.  He reported "[n]o bleeding, bruising, or petechial rashes."  Id. at 141.  Physical examination did not reveal any bruising.  Id. at 142.  Petitioner's platelets were 235 (normal).  Id. at 142, 144.  Dr. Pettee's diagnosis remained chronic ITP.  Id. at 143.  Petitioner was again advised to monitor for fever and continue penicillin.  Id.  Dr. Pettee reported Petitioner was doing well and ordered him to follow up in one year.  Id.

On July 26, 2021, Petitioner was seen by Megan Lough, CNP, for his 17-year-old well child visit and sports physical.  Pet. Ex. 79 at 189-90.  Physical examination did not note bruising or petechiae.  Id. at 192.  Petitioner was participating in wrestling.  Id. at 191.  Ms. Lough stated Petitioner was "[m]edically eligible for all sports without restriction" on his Ohio High School Athletic Association physical examination form.  Id. at 37-38.

Petitioner was seen for acute pharyngitis at ACH on September 29, 2021.  Pet. Ex. 79 at 225.  Physical examination showed "[p]harnx erythema" but noted no other rashes, bruising or petechiae.  Id. at 226.  Assessment noted "[v]iral etiology, self-limited illness."  Id. at 225.

On February 7, 2022, Petitioner had a follow-up visit with Dr. Pettee.  Pet. Ex. 79 at 231.  No bleeding, bruising, or petechial rashes were reported.  Id.  Dr. Pettee noted Petitioner was "doing well" and continued to participate in wrestling.  Id. at 232.  Petitioner reported he was doing well in school and was still interested in trade school and electrician career.  Id.  Physical

examination did not reveal any "rash, bruising, or petechiae." Id. at 233. Platelets were 175 (normal). Id. at 234. Diagnosis remained chronic ITP. Id. at 234. Dr. Pettee directed Petitioner to monitor for fever, to continue penicillin, and to return in one year. Id.

On July 25, 2022, Petitioner was seen by Laurie McGlynn, CNP, for his 18-year-old well child visit. Pet. Ex. 79 at 265. Petitioner was accompanied by his mother. Id. Petitioner reported that he had entered the work force and had a job at a battery plant. Id. Physical examination was normal and did not note bruising or petechiae. Id. at 77. Petitioner received a meningococcal B vaccine at this visit. Id. at 262. Additionally, Ms. McGlynn reported

> [Petitioner] is asking for a letter to move his job at the battery plant he works at. He is worried about his medical history and having to mix battery powders and mixtures. No issues as of this far. I discussed this with Dr. Brine. At this time we both agree, that primary care is not appropriate to write this excuse for [Petitioner]. He can reach out to Hematology, who deals with his chronic immunology issues, and if they want to write the note then they can address it.

Id. at 79. On July 27, 2022, Dr. Pettee, Petitioner's hematologist, provided a letter "to whom it may concern" addressing Petitioner's medical history and work environment. Pet. Ex. 70 at 75. Dr. Pettee wrote,

> [Petitioner] is an 18 [year old] male with a history of chronic ITP that was successfully treated with a spleen removal (splenectomy). Patient[s] who do not have a spleen are at increased risk for pneumococcal pneumonia and sepsis. While I am not aware of any increased risk for pneumonia of this type due to industrial agents, it may be prudent to modify [Petitioner's] work environment as a precaution.

Id.

On October 26, 2022, Petitioner presented to the ACH ED with complaints of elbow pain after falling while skateboarding three days prior. Pet. Ex. 79 at 93-94. An X-ray showed "[n]ormal radiographic appearance of elbow." Id. at 97. Physical examination noted an abrasion on the left elbow and mild swelling but was otherwise normal. Id. at 96. Petitioner was discharged home. Id.

Petitioner was next seen by Megan Lough, CNP, at ACH Quick Care on November 30, 2022 for cold symptoms including cough and congestion. Pet. Ex. 79 at 63. He reported acute onset of symptoms three days earlier and was sent home from work the day prior "for being sick." Id. at 136. An on-demand covid test and a rapid flu test were negative. Id. at 136-37. Physical examination did not show bruising or petechiae. Id. Assessment was acute URI. Id. at 135.

On February 17, 2023, Petitioner was seen by Dr. Pettee for his annual hematology follow-up. Pet. Ex. 79 at 144. Petitioner reported "[n]o bleeding, bruising, or petechial rashes" or "fever, or unusual lumps or bumps." Id. at 145. He also had "[n]ormal energy." Id. Petitioner

reported that he was attending barber school.  Id.  Physical examination was normal.  Id. at 145-46.  Platelets were 216 (normal).  Id. at 147.  The diagnosis remained chronic ITP and Dr. Pettee noted Petitioner was "doing very well."  Id.  Dr. Pettee again directed Petitioner to monitor for fever, to continue penicillin, and to follow-up in one year.  Id.

Petitioner returned to Dr. Pettee on February 26, 2024 for a routine follow-up visit.  Pet. Ex. 79 at 5-6.  He reported no bleeding, bruising, or petechial rashes and reported he was "tolerating [penicillin] well."  Id. at 6.  Physical examination was normal.  Id. at 6-7.  Platelets were 194 (normal).  Id. at 8.  Dr. Pettee reiterated the need to monitor for fever and continue penicillin.  Id.  Dr. Pettee again noted Petitioner was "doing very well" and instructed him to return in one year.  Id.

No additional medical records have been filed.

**B.    Affidavits**

**1.    Petitioner's Affidavit**

Petitioner executed an affidavit on August 25, 2023, addressing the impact of ITP on his life.  Pet. Ex. 71.  Petitioner asserted that "ITP changed [his] life forever" and he will "never be the same as [he] was before this disease."  Id. at ¶ 19.

He was diagnosed with ITP when he was 10 years old.  Pet. Ex. 71 at ¶ 2.  In the three years following his diagnosis, he "went through a lot mentally, emotionally, and physical pain."  Id.

Describing the events surrounding his ITP diagnosis, Petitioner recalled waking up "one morning with bruises from head to toe."  Pet. Ex. 71 at ¶ 4.  His mother took him to the doctor, and they were told he could have leukemia.  Id.  He immediately was sent to get blood work.  Id.  Less than hour later, Petitioner was told he needed to be "directly admitted to [AHC] on the cancer patient floor."  Id.  He was admitted the hospital and immediately given a blood infusion which made him "very sick."  Id. at ¶ 5.  The next morning, Petitioner received another blood infusion which again made him sick.  Id. at ¶ 7.  He was sent home the next day, but he returned two days later for another infusion.  Id.

Petitioner recalled being scared, confused, and "not knowing what was going on" during this time.  Pet. Ex. 71 at ¶¶ 4-5.  While he was at the hospital, a doctor explained "everything about ITP" to his parents, but as a 10-year-old, "[he] had no idea what that was."  Id. at ¶ 6.  It was "a very scary moment in [his] life."  Id. at ¶ 8.

Prior to being diagnosed with ITP, Petitioner averred he was "a very active kid that played every sport, rode ATVs, skateboarded, snowboarded, etc." but when he was diagnosed with ITP that "abruptly ended."  Pet. Ex. 71 at ¶ 3.  After his ITP diagnosis, he was told he had to "quit everything and get used to just playing video games."  Id. at ¶ 9.  He no longer spent time or played with his friends because he was not allowed to "do the things they were doing."  Id.

Petitioner explained that his platelets got so low, he was advised to avoid going on car rides in case he got into an accident.  Id.

Treatment for his condition caused problems.  Petitioner recalled he got sick from the steroids and medication he took.  Pet. Ex. 71 at ¶ 10.  He also gained weight from the steroids and inactivity.  Id.  He was "picked on" due to his weight gain and called names such as "chubby Jake" and "round face," which "really messed with [his] emotions, especially as a pre-teen."  Id.  Petitioner also suffered from "extreme nosebleeds" where he would need to "use an actual towel to catch all the blood until [he] could get it to stop."  Id. at ¶ 8.  He now fears getting nosebleeds.  Id.

Petitioner had to miss school for IVIG treatments.  Pet. Ex. 71 at ¶ 11.  The treatment was "an [eight] hour procedure" and the medications made him sick "to where he would throw up in car on the way to school a lot."  Id.  He was also "tired a lot" which led to him struggling in school.  Id.

When Petitioner was 13 years old, after "three years of treatments with no progress," his doctors recommended a splenectomy.  Pet. Ex. 71 at ¶ 12.  Petitioner was told there was a 50% chance the splenectomy would work.  Id.  Petitioner and his family decided to "take the chance" as he "could not just live [his] life not being able to do anything anymore."  Id.  He missed two weeks of school due to his splenectomy surgery and "fell more behind in school."  Id. at ¶ 13.

After the surgery, his platelets returned to normal levels and "have been good ever since."  Pet. Ex. 71 at ¶ 14.  However, the lack of spleen brings new problems: he has to take penicillin twice a day for life and he must get a pneumonia vaccination every five years.  Id.  Further, he gets anxious whenever he has "a sore throat, or start[s] to get sick" because he doesn't "have a spleen to fight off infections."  Id.

During high school the COVID-19 pandemic began and Petitioner switched to home schooling "as an extra precaution" for an entire school year.  Pet. Ex. 71 at ¶ 15.  When he returned to school, the worry about infection was "always . . . in the back of [his] mind" which was "very stressful."  Id.  Petitioner also described the mental toll of his ITP and splenectomy, explaining that, while his ITP is in remissions, "every time [he] get[s] a bruise, or wake[s] up with a bloody nose" he is "afraid of the ITP coming back."  Id. at ¶ 18.

Addressing his entry into the workforce, Petitioner explained he got a "good job . . . making good money for an 18 year old" at an electric car battery factory.  Pet. Ex. 71 at ¶ 16.  He was in a department where he needed to wear a respirator and work with black carbon.  Id.  Even wearing a mask, the black carbon would cover him in black soot, and he started waking up in the morning with a deep cough.  Id.  Petitioner consulted with his hematologist who wrote a note to his employers asking for Petitioner to be moved to a different department.  Id.  Petitioner averred that he had an "increased risk of contracting pneumonia due to not having a spleen."  Id.  His employer refused to move him.  Id.  Petitioner averred that, after talking to his parents and doctor, he "quit his job because it was in the best interest of [his] health."  Id.  Petitioner asserted that there are jobs and activities he is unable to do because of his "increased risk of getting sick from infections."  Id. at ¶ 17.

### 2.    Other Affidavits

Petitioner's mother, Ms. Ferguson, executed an affidavit in October 2018.  Pet. Ex. 3.
Ms. Ferguson described the events leading up to his ITP diagnosis and Petitioner's subsequent
treatments for ITP.  Id. at ¶¶ 9-17.

In the months leading up to his ITP diagnosis, Petitioner was an active child and
participated in wrestling matches.  Pet. Ex. 3 at ¶¶ 4-6.  "[Petitioner] qualified to go to State
Tournament for wrestling in January 2015.  He was so happy."  Id. at ¶ 10.

In January 2015, Petitioner told his mother he had a rash on his head and she made an
appointment to get it checked.  Resp. Ex. 3 at ¶ 11.  At this appointment she asked his doctor
about his bruising.  Id.  The doctor immediately directed Petitioner to get his blood drawn.  Id.
When Ms. Ferguson asked if the bruising could be from wrestling and if the blood test could
wait, the doctor told her "no, this could be leukemia and you need to get him checked out now."
Id.

Later that day, Ms. Ferguson received a phone call with lab results for Petitioner.  Pet.
Ex. 3 at ¶ 12.  His platelets were "extremely low" and he needed to be taken immediately to
Akron Main Hospital for a direct admission to the oncology/hematology floor.  Id.  Petitioner's
father and grandmother along with his mother drove him to the hospital and "[t]rying not to scare
[Petitioner] told him that the doctor wanted to run tests on him, but that everything would be
okay."  Id. at ¶ 13.

At the hospital, Petitioner started an "IVIG blood infusion" and received his ITP
diagnosis.  Pet. Ex. 3 at ¶ 14.  After the infusion, Petitioner platelets decreased, so he received
another type of infusion.  Id.  A few days later, Petitioner went home.  Id. at ¶ 15.  A few weeks
later, Ms. Ferguson and Petitioner returned to the hospital for another round of infusions.  Id.
Six months later, Petitioner had a bone marrow biopsy because his platelets were still "very
low."  Id.  His diagnosis was now chronic ITP.  Id.

Over a three-year period, Petitioner received "[s]everal blood infusions and steroids" but
he "couldn't get his platelets up."  Pet. Ex. 3 at ¶ 15.  Petitioner's doctors recommended a
splenectomy.  Id. at ¶ 16.  Ms. Ferguson and Petitioner were told there was a "50/50 chance it
would work.  [They] took the chance because [Petitioner] needed his life back.  He wanted to be
active again and not have to worry about everything."  Id.

In October 2017, Petitioner had a splenectomy.  Pet. Ex. 3 at ¶ 17.  "It appeared to have
worked."  Id.  Petitioner will have to take penicillin twice daily for his life and is more
susceptible to infection.  Id.  Ms. Ferguson is "happy with the choice" of splenectomy but notes
that Petitioner will "always have chronic ITP."  Id.

Petitioner's grandmothers, Jolie MacDougall and Vanessa Ferguson, as well as his
wrestling coach, Tony Winterburn, also executed affidavits.  Pet. Exs. 4-6.  These affidavits

addressed the onset of Petitioner's bruising and nosebleeds in 2014.  See id.; see also Ruling on Entitlement at 15-16.

### C.    Education and Employment History

Petitioner graduated from high school in 2022.  He was on varsity wrestling team in high school, and he received offers from several colleges to continue wrestling in college.  Pet. Ex. 65 at 2; Resp. Ex. E at 5.  Petitioner declined the college wrestling offers.  Id.  Prior to his high school graduation, Petitioner expressed interest in attending trade school to become an electrician.  Pet. Ex. 65 at 1.

A few weeks after his high school graduation, Petitioner started working at Ultium Cells, an electric car battery factory.  Pet. Ex. 65 at 1.  His older brother also worked at Ultium Cells. Id.  Petitioner left his position at the battery factory after his employer refused let him move departments.  Pet. Ex. 71 at ¶ 16.  As of December 3, 2023, Petitioner was attending barber school with an anticipated graduation of May 2024.  Pet. Ex. 73 at 1.  Petitioner planned to work at his father's barbershop following graduation.  Id.

### D.    Health Insurance

In December 2023, Petitioner received health insurance coverage through Medicaid while attending barber school.  Pet. Ex. 73 at 1.  Neither of Petitioner's parents carry employer-based health insurance.  Resp. Ex. E at 7.  Petitioner's mother does not carry employer health insurance due to the cost.  Id.  Petitioner's father owns a barber shop and does not carry health insurance due to the cost.  Id.  Instead, they receive coverage through Medicaid.  Id.

The parties proposed their recommended health insurance plans pursuant to an award of health insurance.  Pet. Ex. 81; see also Resp. Ex. I (applying ACA income-based subsidies to the proposed health insurance plan premiums).

Petitioner proposed United Health Care ("UHC") Gold Advantage.  Pet. Ex. 81 at 1. UCH Gold Advantage has an individual deductible of $500.00 and individual maximum out of pocket of $7,000.00.  Id.  The plan has a $10.00 copay for primary care visits, a $75.00 copay for specialist visits, a $50.00 copay for urgent care, and a $500.00 copay for emergency care (after deductible is met).  Id.  Generic drugs, including penicillin VK, have a $3.00 copay with diagnostic testing having a $10.00 copay.  Id.  Premiums are $5,611.32 per year for 2025 through 2028 with higher premiums from 2029 through 2068.  Id. at 1-3.  UHC of Ohio has an A+ credit rating from AM Best Ratings.  Pet. Ex. 82 at 6.

Respondent proposed Ambetter Buckeye Health Clear Gold Plan.  Pet. Ex. 81 at 1. Ambetter Buckeye Health Clear Gold Plan has an individual deductible of $900.00 and individual maximum out of pocket of $8,400.00.  Id.  The plan has a $25.00 copay for primary care visits, a $60.00 copay for specialist visits, a $60.00 copay for urgent care, and 30% coinsurance for emergency care (after deductible is met).  Id.  Generic drugs, such as penicillin VK, have a $15.00 copay with diagnostic testing having a 30% coinsurance for emergency care (after deductible is met).  Id.  Premiums are $3,965.40 per year for 2025 through 2028 with

higher premiums from 2029 through 2068.  Id. at 1-3.  Ambetter Buckeye Health is not rated by AM Best Ratings.  Pet. Ex. 82 at 7-10.  Respondent did not provide a credit rating from another credit rating service.

Respondent proposed that any health insurance premiums should be offset by ACA income-based premium subsidies based on Petitioner's projected income of $35,390.00.  Resp. LCP Br. at 4; see also Resp. Ex. I.  ACA income-based premium subsidies are administered through the advanced premium tax credit.  26 U.S.C. § 36B.

A comparison of both proposed health insurance plans is attached as Appendix A.

## IV.  EXPERT REPORTS

### A.  Medical Experts

#### 1.  Petitioner's Expert, Dr. Edwin N. Forman[20]

Dr. Forman is board-certified in pediatrics, and pediatric hematology-oncology.  Tr. 8. He is an expert in hematological disorders.  Id.

Dr. Forman explained that splenectomy is considered a secondary treatment for ITP that is used when patients are not responsive to drug therapies.  Tr. 15.  He noted splenectomy is "standard therapy if you fail everything else."  Tr. 16.  Splenectomy was "appropriate" treatment for Petitioner who had a transient response to medications and steroids.  Id.  Dr. Forman explained that while the splenectomy procedure itself is "very safe," removing the spleen can be "very costly and it not curative."  Id.  Splenectomy does not cure ITP, instead its role is to get platelets up to a safe level of 150 x $10^9$/L or greater.  Tr. 16-17.  In this case, Petitioner's platelet levels are now at acceptable levels.  Tr. 18.

Dr. Forman provided his opinions on the long-term risks and effects of infection/sepsis, thrombosis, enhanced atherosclerosis, and recurrence of ITP for Petitioner following splenectomy.  Pet. Ex. 34 at 1; Tr. 19-25.

Dr. Forman discussed the risk of overwhelming post-splenectomy infection ("OPSI"). Pet. Ex. 34 at 2.  Dr. Forman identified OPSI as a post-splenectomy complication with "significant morbidity and mortality rates."  Id. (citing Pet. Ex. 40).[21]  In Tahir et al., the authors concluded that splenectomy results in susceptibly "to a variety of respiratory, urinary, and meningeal infections" which can lead to a "severe case of sepsis knows as OPSI."  Pet. Ex. 40 at

---

[20] Dr. Forman submitted three expert reports, one letter, and testified at the hearing.  Pet. Exs. 8, 11, 34, 74; Tr. 6-44.  His first and second reports and his background, education, and experience were previously summarized.  See Ruling on Entitlement at 16-20.

[21] Faryal Tahir et al., Post-Splenectomy Sepsis: A Review of the Literature, 12 Cureus e6898 (2020).

11.  OPSI is a "medical emergency" with rapid cardiovascular collapse and death occurring "within 12-24 hours of the onset of symptoms."  Id. at 8.  The authors noted the prevalence of OPSI is "0.1-0.5% with a mortality rate of up to 50%."  Id. at 7.  Preventive measures include patient education, vaccination, and prophylactic antibiotics.  Id.  The authors noted that splenectomy carries "lifelong increased risk of infection," noting initial signs of OPSI included high-grade fever, "chills, myalgia, headache, vomiting, and abdominal pain" and advising patients to seek medical attention for animal bites and scratches.  Id. at 9 tbl.4.  Further, asplenic patients should receive "pneumococcal, Haemophilus influenza type b (Hib), meningococcal, and annual influenza vaccinations."  Id. at 9.  Due to the risk of sepsis, Dr. Forman explained that asplenic patients need to present to a hospital, have a blood culture, and receive IV antibiotics when they have a fever.  Tr. 19.  Dr. Forman opined that even if Petitioner "follows the directions as carefully as possible, it's still possible he will develop [OPSI]."  Tr. 34.

Next, Dr. Forman testified that after a splenectomy, there is an increased risk of arterial and venous thrombosis.  Tr. 21.  Relying on Weledji,[22] Dr. Forman reported that "[t]hromboebolic complications following splenectomy . . . occur in 10% of patients."  Pet. Ex. 34 at 2 (citing Pet. Ex. 35 at 5).  Weledji focused on thromboembolic events that occurred post-operatively, noting that the median time from splenectomy to splenic vein thrombosis was eight to 12 days.  Pet. Ex. 35 at 5.  Weledji included arterial and venous thrombosis in his table of long-term splenectomy complications.  Id. at 5 tbl.4.  The study did not quantify the risk of arterial and venous thrombosis as long-term complications.  See id.  Crary and Buchanan[23] reported asplenic patients have an increased incidence of venous thromboembolism beyond the two-month portal vein thrombosis risk period that follows surgery.  Pet. Ex. 44 at 3.

Dr. Forman agreed that a patient's underlying condition impacted the risk of thrombosis post-splenectomy.  Tr. 28.  For example, a patient that had a splenectomy for hereditary spherocytosis[24] had a greater post-splenectomy risk of thrombosis than a patient with ITP.  Id.

Addressing the risk of ITP recurrence, Dr. Forman testified that "the efficacy of splenectomy to treat ITP wanes with time."  Tr. 13.  He relied on Mishra et al.[25] and Kuhne et

---

[22] Elroy P. Weledji, Benefits and Risks of Splenectomy, 12 Int'l J. Surgery 113 (2014).

[23] Shelley E. Crary & George R. Buchanan, Vascular Complications After Splenectomy for Hematologic Disorders, 114 Blood 2861 (2009).  This was also filed as Resp. Ex. C, Tab 2.

[24] Hereditary spherocytosis is "a group of clinically and genetically heterogeneous hereditary disorders characterized by the presence of spherocytes, hemolytic anemia, abnormal fragility of erythrocytes, jaundice, and splenomegaly."  Hereditary Spherocytosis, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=107558 (last visited July 9, 2025).

[25] Kundan Mishra et al., Safety and Efficacy of Splenectomy in Immune Thrombocytopenia, 11 Am. J. Blood Rsch. 361 (2021).

al.[26] to support this proposition. Tr. 15 (citing Pet. Ex. 78; Resp. Ex. C, Tab 5). Starting with Mishra et al., Dr. Forman explained the epidemiological study followed 45 patients for five years who underwent splenectomy to treat ITP. Tr. 9-10. The authors found "89.2 percent had a positive response in one month post-splenectomy," which Dr. Forman explained was a "textbook" response rate for splenectomy. Tr. 10 (citing Pet. Ex. 78 at 4). Looking at the patients' results five years post-splenectomy, the relapse free survival rate was 57 percent. Id. (citing Pet. Ex. 78 at 6 fig.2). Dr. Forman explained that figure 2 in Mishra et al. demonstrated that the authors "collected data at multiple intervals over that five-year period." Id. Dr. Forman did not believe that the authors collected further data after that five-year period.[27] Tr. 10-11.

Discussing Kuhne et al., Dr. Forman explained the article was an intercontinental study of splenectomy in children with ITP. Tr. 14. Dr. Foreman explained the authors found 20% of children with splenectomy did not achieve complete remission. Id. (citing Resp. Ex. C, Tab 5 at 3). Kuhne et al. divided patients into three groups following splenectomy: complete response, partial response, and no response. Resp. Ex. C, Tab 5 at 4 fig.1. The authors followed patients for up to 4.5 years. Id. at 3. Dr. Forman agreed that Petitioner was over five years out from his splenectomy and currently in the complete response group for splenectomy patients. Tr. 43. He conceded that "generally" a patient with a favorable response to splenectomy would continue to do well over time. Tr. 38. Further, he testified that it was more likely than not that Petitioner would "continue to do well" given his clinical course. Id.

Another risk identified by Dr. Forman in his third report was the recurrence of ITP after initial splenectomy due to the development or presence of an accessory spleen. Pet. Ex. 34 at 4 (citing Pet. Ex. 47;[28] Pet. Ex. 48).[29] In Leo et al., the authors noted that the failure rate of laparoscopic splenectomy in adults five years after surgery is "approximately 28%" and suggested that relapse of thrombocytopenia is associated with the presence of an accessory spleen. Pet. Ex. 47 at 1, 4. Dr. Forman explained that accessory spleens have been associated

---

[26] Thomas Kuhne et al., Splenectomy in Children with Idiopathic Thrombocytopenic Purpura: A Prospective Study of 134 Children from the Intercontinental Childhood ITP Study Group, 49 Pediatric Blood Cancer 829 (2007).

[27] While the authors did not appear to collect data after the five-year interval, Dr. Forman opined that "it is not unreasonable to presume" that the relapse free survival will continue to decrease as the data showed a "constant downward trend." Tr. 12-13. Dr. Forman testified that that the relapse free survival rate would continue to decline past 50%. Id. While figure two shows a flat line, i.e. remains at 50% relapse survival rate from year five to year 20, Dr. Forman asserted there was no data on this plateau and maintained that the authors stopped collecting data after five years. Tr. 40.

[28] C.A. Leo et al., Postsplenectomy Recurrence of Idiopathic Thrombocytopenic Purpura: Role of Laparoscopic Splenectomy in the Treatment of Accessory Spleen, 36 Il Giornale Di Chirurgia 153 (2015).

[29] Jin Hyun Woo et al., Postsplenectomy Recurrence of Thrombocytopenia with an Accessory Spleen, 19 Korean J. Internal Med. 199 (2004).

with small bowel obstruction, massive gastrointestinal bleeding, and various other complications. Pet. Ex. 34 at 4. Yet, the medical literature he cited to identify these complication addresses splenosis[30] not accessary spleen. See, e.g., Pet. Ex. 50 (discussing a case study of bowel obstruction due to splenosis).[31] Further, Dr. Forman did not opine that Petitioner had developed an accessory spleen or discuss Petitioner's risk for the development of splenosis. See Pet. Ex. 34.

Dr. Forman explained that spontaneous recurrence of ITP and the associated risk of intracranial hemorrhage is also reported in the medical literature. Pet. Ex. 34 at 4. The medical literature provided by Dr. Forman was not limited to the risk of ITP recurrence in post-splenectomy patients. For example, in Jayabose et al.,[32] the authors found that 14 (4.1%) of the children they followed experienced recurrent ITP. Pet. Ex. 55 at 6. One recurrent patient died of intracranial hemorrhage after aggressive treatment which included splenectomy. Id. at 2. Two patients achieved complete remission of their recurrent ITP following a splenectomy. Id. The study did not indicate whether any of the patients were asplenic prior to their ITP recurrence. Another example, an abstract from Vranou et al.,[33] retrospectively reviewed the outcomes of 790 children with ITP. Pet. Ex. 56 at 1-2. The authors noted 5.2% of patients had more than one episode of thrombocytopenia with the majority of these patients (76.6%) having only one episode of recurrence. Id. at 2. One patient suffered intracranial hemorrhage, and no patients required splenectomy. Id.

In his report, Dr. Forman identified enhanced atherosclerosis as a long-term risk following splenectomy. Pet. Ex. 34 at 3. He explained that Weledji as well as Crary and Buchanan identified enhanced atherosclerosis as a long-term complication in asplenic patients. Pet. Ex. 35 at 5 tbl.4; Pet. Ex. 44 at 2. Crary and Buchanan reported on a study by Schilling[34] that found "a 5.6-fold increased rate of arteriosclerotic events (defined as stroke, myocardial infarction, and coronary or carotid artery surgery) in persons older than age 40 years with

---

[30] Splenosis is "the occurrence of multiple ectopic splenic implants in the abdominal or thoracic cavities, usually secondary to trauma that ruptures the splenic capsule." Splenosis, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=46713 (last visited July 9, 2025).

[31] George Younan et al., Splenosis: A Rare Etiology for Bowel Obstruction - A Case Report and Review of the Literature, 2015 Case Reps. Surgery 890602. Petitioner's exhibits 49 through 54 all addressed complications due to splenosis rather than accessory spleen.

[32] Somasundaram Jayabose et al., Recurrent Immune Thrombocytopenic Purpura in Children, 23 Pediatric Hematology & Oncology 677 (2006).

[33] Maria Vranou et al., Recurrent Idiopathic Thrombocytopenia Purpura in Childhood, 121 Pediatrics S122 (2008).

[34] Petitioner did not file this study. Dr. Forman noted that Weledji also relied upon Schilling to support an increased risk of enhanced atherosclerosis. Pet. Ex. 34 at 3.

[hereditary spherocytosis] who had undergone splenectomy compared with persons with [hereditary spherocytosis] who had not had splenectomy." Pet. Ex. 44 at 2-3. The authors did not report on whether there was an increased rate of arteriosclerotic events in patients with ITP as an underlying condition. See id. Dr. Forman also noted that a study by Rorholt et al.[35] found an increased risk of stroke in asplenic patients controlled for underlying disease including ITP. Pet. Ex. 34 at 4 (citing Pet. Ex. 45 at 9). The authors also found an increased risk of myocardial infarction and pulmonary hypertension due to the underlying splenectomy-related disease including ITP. Pet. Ex. 45 at 1. In his testimony, Dr. Forman opined Petitioner was "less likely" to experience complications from atherosclerosis. Tr. 34.

Addressing employment limitations, Dr. Forman would advise Petitioner to not work in "certain situations" such as in remote areas where he could not access medical care if he had a fever. Tr. 30. In his report, he additionally recommended that Petitioner avoid jobs "in a hospital, on a farm, or in veterinary position." Pet. Ex. 34 at 5. He also testified that Petitioner should avoid sedentary jobs due to his increased risk of thrombosis. Tr. 32. Dr. Forman felt it "would be wise" for Petitioner to get a job with more movement "than walking to the bathroom." Id. In support, he cited a study by Same et al.;[36] however, the study did not address the risk of thrombosis due to sedentary employment. Pet. Ex. 34 at 5 (citing Pet. Ex. 62). Instead, the authors addressed on the impact of a sedentary behavior as an independent risk factor in the development of cardiovascular disease. Pet. Ex. 62 at 1.

On cross-examination, Dr. Forman conceded that in his clinical practice he could not recall ever advising an asplenic patient not to take certain employment but noted that his patients "were children at the time." Tr. 27. Dr. Forman could not provide or recall any medical literature on employment limitations in asplenic individuals. Tr. 26. Further, Dr. Forman acknowledged that he had not provided any medical literature that placed "material limitations on the activities in which asplenic patients can participate." Tr. 27. Dr. Forman opined that there were no limitations on "participating in contact sports" or "in whatever he wants" so long as Petitioner had normal platelet levels. Tr. 39.

Dr. Forman testified he was not aware of "any reputable data or information" that an "otherwise healthy young adult" has "reduced or impaired earning capacity" due to splenectomy. Tr. 30. He agreed that Petitioner would be able to work a full-time job at 40 hours a week for 50 weeks each year. Tr. 32. He opined that Petitioner was not physically or intellectually disabled. Tr. 31. Instead, Dr. Forman testified that Petitioner had a "risk disability." Id. Dr. Forman was unable to quantify how the "risk disability" would impact Petitioner's employment. Tr. 31-32. Dr. Forman testified that if Petitioner did experience a recurrence of ITP, it would adversely affect Petitioner's "energy level to work." Tr. 41.

---

[35] Marianne Rorholt et al., Risk of Cardiovascular Events and Pulmonary Hypertension – A Danish Population-Based Cohort Study from 1996-2012, 102 Haematologica 1333 (2017).

[36] Robert Same et al., Relationship Between Sedentary Behavior and Cardiovascular Risk, 18 Current Cardiology Reps. 6 (2016).

Dr. Forman acknowledged that Petitioner had not had any postoperative complications. Tr. 39.

As to health insurance, Dr. Forman testified that Petitioner "needs really excellent coverage" and should be "thoroughly covered" due to his many ITP and post-splenectomy risks. Tr. 24. In his February 2024 letter, Dr. Forman explained that Petitioner needs a health insurance policy that will cover the "inevitable visits" required due to Petitioner's asplenic condition. Pet. Ex. 74 at 1. "A policy with a deductible will leave [Petitioner] with enormous expenses." Id. Relying on two references, Dr. Forman reiterated that post-splenectomy guidelines require asplenic patients to present to a hospital room if they have a fever and asserted that the average adult has four infections per year. Id. (citing Pet. Ex. 75;[37] Pet. Ex. 76).[38] However, Dr. Forman testified that most respiratory infections are not accompanied by fever. Tr. 29. He opined that a fever occurs on average once per year. Tr. 29-30.

### 2.    Respondent's Expert, Dr. John J. Strouse[39]

Dr. Strouse is board-certified in pediatrics, hematology, and pediatric hematology-oncology. Tr. 46. He is an expert in hematological disorders. Tr. 47.

In his report and testimony, Dr. Strouse addressed the long-term effect of childhood splenectomy on health. Resp. Ex. C at 1; Tr. 44-74. He agreed that Petitioner has an increased risk of certain health conditions following his splenectomy including "life threating infection, venous thromboembolism, and recurrent []ITP." Resp. Ex. C at 2.

Addressing the risk of infection and sepsis, Dr. Strouse agreed that Petitioner was at increased risk for OPSI. Resp. Ex. C at 1. This risk can be mitigated by vaccination against organisms, twice daily prophylactic penicillin, and "rapid evaluation" of fevers above 101.5

---

[37] Splenectomy in Adults in Children: Factsheet for Health Professionals, HSC Pub. Health Agency, https://www.publichealth.hscni.net/publications/splenectomy-factsheet-health-professionals-0 (last accessed Mar. 5, 2024).

[38] Lynne Eldridge, Why You Keep Getting Upper Respiratory Infections: Potential Causes and When to be Concerned, Very Well Health, https://www.verywellhealth.com/recurrent-respiratory-infections-in-adults-4777146 (last updated Sept. 3, 2023).

[39] Dr. Strouse submitted two expert reports and testified at the hearing. Resp. Exs. A, C; Tr. 44-76. His first report along with his education, background, and experience were previously summarized. See Ruling on Entitlement at 21-23.

degrees.  Id. at 1.  He also recommended that Petitioner get antibiotics for any animal bites to reduce the risk of serious infection due from "*Capnocytophagia* species."[40]  Id.

He testified that the risk of OPSI is greatest in the first year after splenectomy.  Tr. 48. He explained that vaccination against pneumococcus, Hib, and meningococcus organisms "substantially" reduces the risk of OPSI.  Id.; Resp. Ex. C at 1.  Dr. Strouse acknowledged that there are other types of bacteria and causes of OPSI that do not have preventative vaccines.  Tr. 61.  He also agreed that bacterial infections "can be very dangerous" for asplenic patients.  Id.

Due to the risk of OPSI, Dr. Strouse explained that asplenic patients are advised to report to the ED, rather than a primary care physician, if they have a fever of 101.5 degrees or higher. Tr. 49.  Patients should seek care from the ED so that they can "have a blood counts, a blood culture, and then receive empiric antibiotics . . . that cover the typical bacteria can cause serious infection."  Tr. 49-50.  Dr. Strouse further explained that that an ED is "the only place" where patients can reliably and rapidly receive these tests and treatments.  Tr. 50.  Addressing prophylactic penicillin, Dr. Strouse explained that while the standard of care for children is to receive daily penicillin, in his experience, most adults are not on lifelong penicillin.  Tr. 51-52.

On cross-examination, Dr. Strouse opined that there was "pretty good risk" that Petitioner would suffer "some bacterial infection" over the next 60 years.  Tr. 75.  He also opined that he "expects" Petitioner will have fevers of over 101.5 degrees over the next 60 years.  Tr. 76. "Maybe once every [10] years."  Id.  Based on his own experience, Dr. Strouse explained that high fevers in adults is not a "frequent occurrence."  Id.  Dr. Strouse opined that over the next 60 years there is less than 10 percent chance but greater than one percent chance that Petitioner will suffer OPSI.  Tr. 69-70.

Next, Dr. Strouse discussed the risk of thrombosis.  He explained "two things drive thrombosis risk after splenectomy."  Tr. 52.  First, there is a risk of thrombosis immediately post-splenectomy due to "recent surgery and immobility and other things."  Id.  Next, there is a risk of thrombosis due to high platelet count.  Tr. 53.  Dr. Strouse noted that this risk was highest in individuals who had splenectomy due to hemolytic anemias such as hereditary spherocytosis or sickle cell disease.  Id.; Resp. Ex. C at 1 (citing Resp. Ex. C, Tab 2).  In Crary and Buchanan, the authors found that "risk of thromboembolic events . . . varies greatly depending on the underlying condition for which the splenectomy is performed."  Resp. Ex. C, Tab 2 at 2.  Dr. Strouse opined that Petitioner's risk of thrombosis "probably is increased some" but not as much as patients whose splenectomy was due to hemolytic anemias.  Tr. 53.  Dr. Strouse concluded that Petitioner did not have an increased of arterial thrombosis.  Tr. 70.  Petitioner does have an increased risk of venous thrombosis that is about double the general population, but the increased risk is less than "the general group of people having splenectomies" because Petitioner doesn't

---

[40] *Capnocytophaga* species can "cause infections among individuals exposed to dogs, or rarely cats, after a bite" and can "cause a variety of infections."  Marcia B. Goldberg, Capnocytophaga, UpToDate, https://www.uptodate.com/contents/capnocytophaga (last updated July 25, 2024). "Patients at greatest risk for severe infection include immunocompromised individuals, particularly those with asplenia, functional asplenia, liver disease (eg, cirrhosis), or alcohol use disorder."  Id.

have hemolytic anemia.  Id.  Accordingly, Dr. Strouse opined that Petitioner's lifetime risk for venous thrombosis was increased by five percent.  Tr. 71.

Addressing recurrent ITP, Dr. Strouse opined that over the next 60 years there was a 10 percent chance or less that Petitioner would suffer an ITP recurrence.  Tr. 69-70.

Dr. Strouse acknowledged that late ITP relapses do occur in patients who had a complete response to splenectomy.  Tr. 57.  Dr. Strouse opined that Kuhne et al. provides the best information on the frequency of ITP relapse following splenectomy in children with ITP.  Id.  Relying on Kuhne et al., Dr. Strouse explained that the risk of ITP recurrence after splenectomy is greatest in the first post-operative year.  Resp. Ex. C at 2.

Dr. Strouse disagreed that Mishra et al. demonstrated that the efficacy of splenectomy waned over time.  Tr. 58.  Dr. Strouse explained that the authors in Mishra et al. followed asplenic patients for a median of 5.02 years with half of patients followed for less than five years and half followed for more than five years.  Id.  In their only reference to follow-up length, the authors reported that "[d]uring the median follow-up of 5.02 years, range, [one] month through 20 years, none of our patients developed venous thromboembolism."  Tr. 59 (quoting Pet. Ex. 78 at 8).  Dr. Strouse explained that while the authors only referenced venous thrombosis in the 20 year time range, the authors would also have been following the patients for "multiple events of interest" including "ITP recurrence, venous thromboembolism, arterial thrombosis, [OPSI]."  Tr. 65.  Further, Dr. Strouse explained that Mishra et al. followed middle-aged patients which are "very different" than patients who have ITP as children.  Id.

Dr. Strouse did not believe that Petitioner had an increased risk of enhanced atherosclerosis due to splenectomy.  Resp. Ex. C at 2.  He explained that this while this risk was present in a World War II cohort study that followed splenectomy for trauma in military veterans, it was not present in a more recent cohort study.  Id. (citing Resp. Ex. C, Tab 3;[41] Resp. Ex. C, Tab 4).[42]  Dr. Strouse opined that confounding factors were present in the World War II cohort.  Id.; Tr. 56.  The more recent cohort study by Kristinsson et al. found an increased risk of hospitalization for pneumonia, meningitis, and septicemia, deep vein thrombosis, pulmonary embolism, as well as certain cancers, but did not note an increased risk of enhanced atherosclerosis in veterans following splenectomy.  Resp. Ex. C, Tab 3 at 1.  Dr. Strouse opined that Petitioner is not in the high-risk category for enhanced atherosclerosis due to splenectomy.  Tr. 71.

As to employment limitations in asplenic patients, Dr. Strouse opined that post-splenectomy risks did not "significantly limit" Petitioner's employment opportunities "with the exception of unusual jobs without reasonable access to emergency care."  Resp. Ex. C at 2.  He recommended against jobs that would require Petitioner to "be quite a distance from medical

---

[41] Sigurdur Y. Kristinsson et al., Long-term Risks After Splenectomy Among 8,149 Cancer-Free American Veterans: A Cohort Study with up to 27 Years Follow-up, 99 Haematologica 392 (2014).

[42] C. Dennis Robinette & Joseph F. Fraumeni, Splenectomy and Subsequent Mortality in Veterans of the 1939-1945 War, 2 Lancet 127 (1977).  This was also filed as Pet. Ex. 46.

care without the ability to get transport" to medical care.  Tr. 55.  For example, working as a wilderness guide, in commercial fishing, or the forest service jobs that are "off the grid."  Id.; Resp. Ex. C at 2.  He explained that asplenic patients need "really some careful planning" if they are going somewhere where they cannot get "reliable emergency care" within one to two days.  Tr. 55.  Dr. Strouse also testified that Petitioner would not qualify to join the U.S. military due to his ITP and splenectomy.  Tr. 54.

Dr. Strouse disagreed that "desk jobs" are contraindicated for asplenic patients.  Tr. 54-55.  He explained that risk of thrombosis in sedentary jobs is reduced by walking to a desk or getting up for the bathroom during the workday.  Tr. 54; Resp. Ex. C at 2.  In his practice, Dr. Strouse does not "put limitations on office jobs for people that had a splenectomy."  Tr. 54.  He is not aware of, nor could he find, limitations on employment as a firefighter or police officer based on splenectomy.  Tr. 73.  He opined that splenectomy does not limit patients from healthcare careers.  Tr. 72.  In his personal experience, he is aware of individuals working in healthcare careers following splenectomy for "autoimmune hemolytic anemia and other immune-mediated cytopenia."  Id.

Dr. Strouse was not aware of "any reputable data or information" that an "otherwise healthy young adult" has "reduced or impaired earning capacity due to having splenectomy for ITP."  Tr. 72.  Nor was he aware of medical literature on this subject.  Id.  However, Dr. Strouse noted that this "is not [his] expertise."  Id.

Dr. Strouse opined that Petitioner would be able to work a full-time job at 40 hours a week for 50 weeks each year.  Tr. 73.  He did not conclude that Petitioner's earning capacity was impaired by virtue of his splenectomy.  Id.  Dr. Strouse opined that Petitioner's splenectomy did not preclude him from attending college if desired.  Tr. 74.  Dr. Strouse agreed that Petitioner could "play contact sports or do anything he wants as long as his platelet count is normal."  Id.

Addressing Petitioner's life expectancy, Dr. Strouse stated he didn't "have any knowledge of life expectancy for patients with splenectomy and ITP."  Tr. 74.  However, he explained that due to the "small risk" of a serious infection that can cause early death, it "probably does shorten life expectancy a small amount" by "a year perhaps."  Id.  He did not opine, however, that it reduced work-life expectancy.

Regarding health insurance, Dr. Strouse agreed that Petitioner, as a post-splenectomy ITP patient, "needs to have good access to healthcare" and should have "whatever is necessary for him to have good access to healthcare."  Tr. 61.  Dr. Strouse explained that Petitioner requires "continued follow-up, preventative therapies to reduce his risk of serious infection, rapid evaluation of fever," as well as "annual [CBC] and emergency evaluation of any symptoms or signs concerning for a relapse of []ITP."  Resp. Ex. C at 4.

**B.     Economic Experts**

**1.     Petitioner's Expert, Dr. Mark McNulty**[43]

_____

[43] Dr. McNulty provided two expert reports.  Pet. Exs. 66, 72.

Dr. McNulty holds a Ph.D. in economics and statistics from Iowa State University.  Pet. Ex. 67 at 1.  He previously held academic research positions and later worked on "litigation related consulting projects regarding business contracts, employment termination, personal injury, and wrongful death.  Id.  He is currently working at Economic Solutions, LLC.  Id.

Dr. McNulty provided an opinion on "probable loss of earnings sustained" by Petitioner. Pet. Exs. 66, 72.

Dr. McNulty stated that based on the reports of Dr. Forman, and Petitioner's life care planners, Petitioner will be "limited in the kind and amount of work he can do" and thus has a "work disability."  Pet. Ex. 66 at 1 (quoting Pet. Ex. 65 at 10).  Dr. McNulty opined that Petitioner can be expected to have reduced productivity and reduced earning capacity due to this work disability.  Id.  He explained that vaccine injury reduces earning capacity when the injury creates a work disability.  Id.

Dr. McNulty defined a work disability as a reduction of an individual's productivity in the labor market.  Pet. Ex. 66 at 2.  He stated the Bureau of Labor Statistics ("BLS")/Census defines individuals as having a work disability if they meet any of the seven criteria set out by the Annual Social and Economic ("ASEC") supplement to the Consumer Population Survey ("CPS").  Id.  Dr. McNulty asserted that Petitioner fits criterion one: "Individuals who have a health problem or disability which prevents them from working or limits the kind or amount of work they can do."  Id. at 3-4.  Dr. McNulty asserted that individuals who meet criterion one but not criteria three through seven or the BLS/Census definition of general disability, should be classified as having a "modified work disability."  Id. at 4.

Relying on data from the ASEC, Dr. McNulty compared the earnings of workers in the non-farm sector with workers who have a "moderate work disability."  Pet. Ex. 66 at 4, 12 tbl.1.[44]  Dr. McNulty did not provide a definition of "moderate work disability" and in his computational table one, he again used the term "modified work disability."  Id. at 12 tbl.1.  He concluded that "disabled-worker earnings" are 76.8% of all worker earnings.  Id. at 4, 12 tbl.1. Again, Dr. McNulty does not provide a definition of "disabled-worker;" however, based on table one, he appears to be referring to workers with "modified work disability."  See id. at 5, 12 tbl.1. Dr. McNulty noted there was additional 2.9% loss due to the increased likelihood of unemployment.  Id. at 4-5.[45]

---

[44] Dr. McNulty also provided an appendix with the data used and his statistical analysis.  Pet. Ex. 66 at 13-37.

[45] Dr. McNulty did not provide an exact number for total reduction in earnings capacity. Petitioner, citing Dr. McNulty's report, adopted a lost earnings capacity of 25.5% in his lost wages memorandum.  Pet. Lost Wages Memo. at 3 (citing Pet. Ex. 66 at 5).  Summarizing Dr. McNulty's opinion, Dr. Kennedy explained that a 23.2% earning capacity reduction further reduced by 2.9%, to account for unemployment rates, results in a total reduction in earning capacity of 25.5%.  Resp. Ex. D at 3.

Responding to Dr. Kennedy's critiques about ASEC data, Dr. McNulty acknowledged that the Census warns users to assess the appropriateness of disability criteria but maintained the BLS/Census criteria are "clearly appropriate" for this use.  Pet. Ex. 72 at 2-3; Pet. Ex. 66 at 5.  Further, Dr. McNulty noted "measuring the impact of disability on wages" was "certainly within [his] expertise as a labor economist."  Pet. Ex. 72 at 2.

The remainder of Dr. McNulty's reports discussed the appropriate calculation and incorporation of retirement benefits, social security benefits, offsets, discounts, and work-life expectancy into his loss of earnings calculation which the undersigned has reviewed but not summarized for the sake of brevity.  Pet. Ex. 66 at 5-10; Pet. Ex. 72 at 3-5.

## 2.    Respondent's Expert, Dr. Patrick Kennedy[46]

Dr. Kennedy is an economist and Managing Director with Torrey Partners, an expert services firm providing independent expert testimony, analysis, valuation and strategic consulting services to clients.  Resp. Ex. D at 1.  He holds a Ph.D. in Economics from Stanford University.  Id.

Dr. Kennedy did not prepare an economic loss calculation as he opined Petitioner "will not suffer any loss of earning capacity" related to his vaccine injury.  Resp. Ex. D at 2.  He based his conclusion that Petitioner is "not disabled and will not suffer a loss of earnings" on Dr. Strouse's expert report.  Id.  He noted that the only employment limitations Dr. Strouse identified were "unusual jobs without access to emergency care such as commercial fishing or working as a wilderness guide."  Id. (quoting Resp. Ex. C at 2).  Petitioner was not precluded from desk jobs. Id.

Relying on data from the BLS, Dr. Kennedy explained that only 461,750 or 0.3% of jobs in the United States are in the farming, fishing, and forestry industry.[47]  Resp. Ex. D at 2.  He also cited a study by Carr et al.,[48] reporting that 98% of the U.S. population has access to an ED within 60 minutes.  Id.

The balance of Dr. Kennedy's report critiqued Dr. McNulty's loss of earning capacity calculations.  Resp. Ex. D at 2-7.  Of note, Dr. Kennedy disagreed with Dr. McNulty's reliance on the ASEC supplement to the CPS in calculating a 25.5% reduction in earning capacity.  Id. at 3.  Dr. Kennedy explained that the Census specifically cautions users of the ASEC that while the CPS identifies the population with a work disability, the questions used for this purpose were not designed "with the intent of measuring disability."  Id. at 3.  Additionally, Dr. McNulty relies on the first screening question used by the ASEC; however, the Census Bureau explicitly identified

---

[46] Dr. Kennedy provided one expert report.  Resp. Ex. D.

[47] Occupational Employment and Wage Statistics, U.S. Bureau of Labor Stats., https://www.bls.gov/oes/tables.htm#00-0000 (last visited June 23, 2025).

[48] B.G. Carr et al., Access to Emergency Medicine, 54 Annals Emergency Med. 261 (2009). Respondent did not file this study.

the limitations of this question.  Id.  These limitations in the underlying data are "shared by a number of forensic economists" and call into question the use of this data for these purposes.  Id.  Dr. Kennedy cited to a study by Robinson[49] that found a "majority of forensic practitioners" believe that government survey data like ASEC "should not be applied to the calculation of mitigating earnings in personal injury litigation."  Id. at 3 fn.17.  Finally, Dr. Kennedy questioned Dr. McNulty's decision to disregard the 20% loss of earning proposed by Petitioner's life care planner and calculate his own 25.5% loss of earnings.  Id. at 3; see also Pet. Ex. 65 at 10 (estimating a 20% loss of earnings over Petitioner's work life).

Dr. Kennedy also provides specific critiques of Dr. McNulty's calculation of earnings basis, wage growth, retirement benefits, social security earning, period of loss and work life opinions which the undersigned has reviewed but not summarized for the sake of brevity.  Resp. Ex. D at 5-7.

### C.    Vocational Experts

#### 1.    Petitioner's Experts, Elizabeth Kattman and Helen Woodward

Petitioner's vocational expert, Elizabeth Kattman, MS, CRC, CLCP, CCM, is a rehabilitation counselor at ReEntry Rehabilitation Service, Inc.  Pet. Ex. 77 at 3.  Ms. Kattman conducted interviews with Petitioner, Ms. Ferguson, Dr. Forman, Dr. Pettee, and Respondent's vocational expert.  Pet. Ex. 65 at 1, 6-8; see Resp. Ex. E at 2.  Ms. Kattman provided four reports regarding the life care plan.[50]  Pet. Ex. 65, 73, 77, 80.  Another rehabilitation counselor, Helen Woodward, MA, CVE, ABVE/D, CLCP, CDMS, co-signed two of Ms. Kattman's reports.  See Pet. Ex. 65 at 13; Pet. Ex. 77 at 3.

Ms. Kattman provided opinions on lost earning capacity and future medical expenses.  Ms. Kattman opined that Petitioner would be "limited in the kind and amount of work he can do" and thus "likely function[s] as an individual with a work disability."  Pet. Ex. 65 at 10.  Ms. Kattman interviewed Dr. Pettee and reported "Dr. Pettee has advised [Petitioner] not to engage in professional contact sports and not to do work that puts him at risk for injury to his head or abdomen."  Id. at 8.  Dr. Pettee did not place any limitations on sedentary work.  See id.  Based on Dr. Pettee's recommendation as well as Dr. Forman's report and recommendations, Ms. Kattman asserted Petitioner was precluded from professional contact sports, military or police positions, sedentary or desk jobs, "work that increases his exposure to infection (in crowds, health care settings, farms or with animals)," and work in remote locations.  Id. at 8, 10.  Relying on the Occupational Requirements Survey ("ORS") conducted by the BLS, Ms. Kattman explained "sedentary jobs, in 2021, made up 28.5% of the work force" and "78.1% of jobs in 2021 required a worker have interaction with the general public."  Id. at 10.  Ms. Kattman concluded that these job limitations as well as longer search time for a job and any time out of

---

[49] Respondent did not file this study.

[50] Petitioner's Exhibit 65, dated August 30, 2022, is titled "updated report" and contains references to a previous report.  Pet. Ex. 65 at 1, 6.   However, Petitioner's Exhibit 65 was the first report filed from Ms. Kattman in this case.

the labor market due to medical complications created "will likely result in an estimated 20% loss of earnings over his work life." Id.

As to medical expenses, Ms. Kattman noted that Petitioner was insured through Medicaid, and that after he receives an award here, he will no longer be eligible for Medicaid. Pet. Ex. 73 at 1. Based on information obtained from Dr. Pettee[51] and Dr. Forman, she opined that health insurance was "imperative" due to Petitioner's risk of infection, recurrence of ITP, thrombosis, and other autoimmune disorders and related treatment. Pet. Ex. 65 at 10. Petitioner will have more ED visits and hospitalizations than average. Id. at 11. She specifically opined that Petitioner would "need emergency department evaluations, likely two to four times per year, per Dr. Forman and referenced literature." Pet. Ex. 77 at 1. Ms. Kattman recommended that Petitioner be awarded health care premiums as well as the annual maximum out of pocket payment. Pet. Ex. 65 at 11; Pet. Ex. 73 at 1, 4.

Ms. Kattman provided estimated cost for ED visits as well as any hospitalization due to infection or low platelet count. Pet. Ex. 77 at 1-3. She estimated these costs as follows. A single ED visit would cost between $2,203.00 and $8,011.00 representing professions fees, facility fees, and three to four diagnostic tests. Id. at 1. "Medications, additional imaging and laboratory testing, consultations, etc." would be additional costs with the "exact needs determined each visit." Id. The annual cost for three ED visits was projected to cost between $6.609.00 to $24,033.00. Id. at 2. Hospitalizations for infection were estimated to cost between $24,726.00 and $86,092.00 for a three-to-six-day hospital stay. Id. Hospitalization for low platelets was projected to cost between $63,104.00 and $80,831.00 for 4.6 to 4.7 days. Id. at 3.

## 2.    Respondent's Expert, M. Virginia NeSmith Walton

Respondent's vocational expert, M. Virginia NeSmith Walton, MSN, RN, FNP, is a certified nurse life care planner. Resp. Ex. F at 1. She prepared three life care plans. Resp. Exs. E, G, H. Ms. Walton did not address whether Petitioner's earning capacity was impaired and did not document any limitations on employment.

As to future medical costs, Ms. Walton agreed that Petitioner "may have a greater risk of hospitalization or ED visits due to infection" than someone without post-splenectomy ITP; however, Ms. Walton asserted there was a less than 50% risk of ED visits in Petitioner's lifetime related to ITP and splenectomy. Resp. Ex. G at 2; see also Resp. Ex. H at 4. In an earlier report, Ms. Walton instead recommended the two additional primary care visits for "early management of any potential infection." Resp. Ex. E at 10.

Ms. Walton did not provide an estimate of the actual cost of ED visits or hospitalizations as she opined there was "lack of probable need" for either of these services. Resp. Ex. H at 4-7.

---

[51] In her interview with Dr. Pettee, he stated that Petitioner "might require emergency room visits related to the ITP every 10 to 15 years." Pet. Ex. 65 at 8. Since this opinion was not expressed to a reasonable degree of medical probability, the undersigned affords less weight to it than the opinions of the medical experts who testified at the hearing. Of note, it is consistent with the opinion of Respondent's expert on this issue.

V.    **PARTIES' CONTENTIONS**

   A.    **Pain and Suffering**

      1.    **Petitioner's Contentions**

Petitioner requests the statutory cap of $250,000.00 for past pain and suffering.  Pet. Pain and Suffering Memo. at 4-5.  Petitioner contends his case has been severe, lasting over nine years.  Id. at 4.  He further contends his ITP "took away" his previously "very active and sports minded" childhood, resulted in painful treatments, weight gain, and strained relationships with his peers.  Id. at 2.  His splenectomy resulted in lifelong use of twice daily penicillin and causes him to "live with fear of infections.  Id.

Petitioner further argues that he is entitled to future pain and suffering reduced by net-present value if the statutory cap is not met in the award for past pain and suffering.  Pet. Pain and Suffering Memo. at 5.

      2.    **Respondent's Contentions**

Respondent argues that based on the facts of this case, Petitioner should be awarded $125,000.00 for pain and suffering.  Resp. Br. at 2, 10.

Respondent does not dispute awareness of the injury.  Resp. Br. at 8.  Addressing Petitioner's pre-splenectomy ITP pain and suffering, Respondent notes that approximately two years and ten months passed from Petitioner's mother expressing concerns about his bruising in January 2015 to his successful splenectomy in October 25, 2017.  Id. at 9.  During this timeframe, Respondent agrees that Petitioner's platelet levels were "medically alarming," however, Respondent also argues that the medical records do not reflect that Petitioner's "outward symptoms were severe."  Id.  Rather, Petitioner's main symptoms objectively documented were petechiae, nosebleeds, and "significant bruising."  Id.  Respondent acknowledges that at least one medical encounter, dated July 15, 2015, notes Petitioner experienced pain in thighs, lower legs, and ankles for the past two-to-three months that had slowly improved.  Id. (citing Pet. Ex. 1 at 55).  However, Respondent asserts that Petitioner "did not appear to have limited his activity" based on the medical records.  Id.  Respondent also acknowledges the treatments that Petitioner had to undergo treatments including IVIG during hospitalization, bone marrow aspiration and biopsy, steroid (dexamethasone) therapy, and laparoscopic splenectomy.  Id.

Addressing post-splenectomy pain and suffering, Respondent contends that Petitioner did not any experience any ITP-related pain and suffering since his splenectomy.  Resp. Br. at 9.  Respondent asserts that the arguable only factors for post-splenectomy emotional distress are "the inconvenience" of long-term prophylactic penicillin long-term and "a fear of a higher, but still low, risk of complication from infections in comparison to the general population" and a low but increased risk of complications such as a thromboembolism.  Id.

Further, Respondent contends that pain and suffering awards should be guided by the continuum approach in <u>Hocraffer</u> "awarding the highest pain and suffering to the most injured and reducing the pain and suffering for lessor [sic] injuries." Resp. Br. at 7 (quoting <u>Hocraffer v. Sec'y of Health & Hum. Servs.</u>, No. 99-533V, 2007 WL 914914 (Fed. Cl. Spec. Mstr. Feb. 28, 2007), <u>remanded in part on other grounds</u>, 2007 WL 5180525 (Fed. Cl. July 13, 2007), <u>aff'd</u>, 66 F. App'x 161 (Fed. Cir. 2010)). Respondent disputes the reasoning of <u>Graves</u> to "the extent that the case calls into question comparing the relative severity of pain and suffering between petitioners within [the] Program" and notes that <u>Graves</u> is not binding on the undersigned in this case. <u>Id.</u> at 8 fn.2 (citing <u>Graves v. Sec'y of Health & Hum. Servs.</u>, 109 Fed. Cl. 579 (2013)).

**B.    Lost Wages**

**1.    Petitioner's Contentions**[52]

Petitioner seeks an award of total lost earnings in the amount of $270,889.00 as calculated by Dr. McNulty. Pet. Lost Wages Memo. at 11; Pet. Lost Wages Reply at 3.

Petitioner asserts that as a result of his ITP and splenectomy, he faces limitations in both the kind and amount of work he will be able to do. Pet. Lost Wages Memo. at 6. He must avoid sedentary jobs, health care jobs, jobs in the miliary, and farm work. <u>Id.</u> He must live in close proximity to a hospital. <u>Id.</u> And he will likely miss substantial time from work over his lifetime. <u>Id.</u> Accordingly, Petitioner asserts his earning capacity will be impaired. <u>Id.</u>

Petitioner recognizes the loss of earnings for minors is governed by § 15(a)(3)(B) and accepts <u>Holihan v. Secretary of Health & Human Services</u>, 45 Fed. Cl. 201 (1999) as persuasive authority in his case. Pet. Lost Wages Memo. at 6-9. Petitioner argues that <u>Holihan</u> instructs the Court to determine whether a minor suffered a loss of earnings capacity that would result in earnings that would be less than the average private, non-farm wage. <u>Id.</u> (citing <u>Holihan</u>, 45 Fed. Cl. at 206). If yes, the minor vaccinee is entitled to receive an award that "brings them up to the average private, nonfarm wage." <u>Id.</u>

Further, Petitioner asserts that his current position as a barber provides direct evidence that his future earnings will be less than the average, private non-farm wage. Pet. Lost Wages Reply at 2. Petitioner contends that he left his job at a battery factory and decided to train as a barber due to the career limitations placed upon him by his splenectomy. <u>Id.</u> While Petitioner acknowledges that his loss of earnings claim is governed by § 15(a)(3)(B), he notes that under § 15(a)(3)(A) he would be entitled to the actual loss of earning incurred by switching jobs. <u>Id.</u> Petitioner contends that average private nonfarm wage is $72,000.00 and contends Petitioner will earn an average of $35,000.00 as a barber. <u>Id.</u> Petitioner also argues that his earning capacity has been impaired by 25% due to his vaccine injury. Pet. Lost Wages Memo. at 11.

---

[52] Petitioner makes additional arguments regarding the appropriate treatment of social security earning for a minor awarded lost wages under the Vaccine Act. Pet. Lost Wages Br. at 8-10. As the undersigned has not awarded lost wages, she does not address the social security earnings issue this Ruling.

### 2.    Respondent's Contentions

Respondent disagrees that Petitioner is entitled to any lost earnings award.  Resp. Br. at 10.

Respondent first contends that Petitioner has not established any impairment to his earning capacity.  Resp. Br. at 11.  Respondent argues that while it may be reasonably recommended that Petitioner should not take certain jobs, these recommendations do not exclude a class of jobs "pervasive enough to impact his overall earning capacity."  Id.

Next, Respondent argues that, even if Petitioner has an impaired earning capacity due to vaccine injury, he has not established that he is not reasonably capable of earning the average, private non-farm wage.  Resp. Br. at 11.  Respondent asserts that when a child vaccinee is capable of earning the average, private non-farm wage, he is not entitled to lost wages award even if the vaccinee's earning capacity is otherwise diminished.  Id. (citing Holihan, 45 Fed. Cl. at 205).

### C.    Unreimbursable Expenses

The parties agree on the majority of future expenses in the life care plan.[53]  Resp. LCP Br. at 2; Pet. LCP Memo. at 1-2.  However, the parties disagree on whether Petitioner is entitled to health insurance.  If entitled to health insurance, they disagree as to what plan is most appropriate.

### 1.    Petitioner's Contentions

Petitioner contends that he is entitled to "the cost of privately purchased health insurance and the cost of copays and deductibles" to cover his future medical expenses causes by his post-splenectomy ITP.  Pet. LCP Brief at 1; Reply at 1.  Petitioner notes that the payment of health insurance premiums and copays are permissible item of compensations where "insurance can help cover those medical risks for which compensation would otherwise be allowable under the Act and where the insurance is, in fact, a lower-cost alternative to the funding of those risks."  Id. (quoting Huber v. Sec'y of Health & Hum. Servs., 22 Cl. Ct. 255, 257 (1991)).

Petitioner notes that he has a chronic disease and is missing part of his immune system.  Pet. LCP Memo. at 2.  He states it is undisputed that his ITP may return "at any time during his life."  Id.  Additionally, it is undisputed that when he suffers an infection or significant fever, he must seek medical treatment.  Id.  The cost of this medical care will be significant and would "be financially ruinous."  Id.

Health insurance is "reasonable and necessary" to protect Petitioner against these "known medical risks."  Pet. LCP Reply at 3.  Petitioner calculates that an ED visit would cost between

---

[53] Specifically, the parties agree on the future expenses of "(1) two additional primary care visits per year; (2) annual hematology follow-up; (3) an annual [CBC]; (4) penicillin; and (5) an alert bracelet."  Resp. LCP Br. at 2; see also Resp. Ex. H.

$2,203.00 and $8,011.00 per visit with three visits a year costing up to $24,033.00 a year excluding the costs of "laboratory testing, imaging, medications, specific consultations, etc." Id. Hospitalization for infection or recurrent ITP could cost between $24,726.00 and $91,039.00. Id. Petitioner contends that "cost of health insurance is less than the probable medical cost [he] is likely to face in the future because of his ITP and post-splenectomy status." Id.

### 2.    Respondent's Contentions

Respondent argues that Petitioner is not entitled to any Program funded health insurance premiums and maximum out of pocket deductibles because these are "ordinary cost[s] of life" and only allowable where it presents a lower cost alternative to compensation in full for vaccine-related care. Resp. LCP Br. at 2 (citing Huber, 22 Cl. Ct. at 257).

In essence, Respondent argues that Petitioner's vaccine-related health care needs are not large enough to justify the award of a health insurance policy. Resp. LCP Br. at 2. Respondent contends that there is not a "reasonable likelihood" of an emergency occurrence that will result in substantial additional medical costs that are vaccine related. Id. at 5. Additionally, Respondent relies on Schwenk to argue that insurance is not funded through the Program when substantial evidence indicates that a petitioner will be gainfully employed. Id. at 3 (citing Schwenk v. Sec'y of Health & Hum. Servs., No. 90-44V, 1991 WL 41538, at *11 (Fed. Cl. Spec. Mstr. Mar. 12, 1991), modified, 23 Cl. Ct. 287 (1991), aff'd, 956 F.2d 1173 (Fed. Cir. 1992)). Respondent concludes that Petitioner's demand for insurance costs constitutes a "contingency funding" prohibited by the Program. Id. at 5 (citing Neher ex rel. Neher v. Sec'y of Health & Hum. Servs., 984 F.2d 1195, 1199 (Fed. Cir. 1993)).

Respondent does not dispute that Petitioner will require emergency care for evaluation and treatment of fever or the costs attendant to that care. The frequency of such care is disputed.

Finally, the parties dispute whether it appropriate to apply the available ACA premium subsidies to the cost of health insurance premiums. Petitioner argues that it is not appropriate to rely on the subsidy costs in pricing insurance. Pet. LCP Reply at 3. Additionally, Petitioner contends that the "political fate" of the ACA premium subsidies is uncertain; it is unclear that the subsidy would be transferable should Petitioner leave Ohio; and the "costing model for ACA subsidized insurance could change any year." Id.

## VI.    LEGAL FRAMEWORK AND ANALYSIS

Petitioner "bear[s] the burden of proof with respect to each element of compensation requested." Brewer v. Sec'y of Health & Hum. Servs., No. 93-0092V, 1996 WL 147722, at *22 (Fed. Cl. Spec. Mstr. Mar. 18, 1996); see also § 11(e) ("[P]etitioner shall submit . . . assessments, evaluations, and prognoses and such other records and documents as are reasonably necessary for the determination of the amount of compensation to be paid to, or on behalf of, the person who suffered such injury . . . ."). Petitioner's burden of proof is by a preponderance of the evidence. § 13(a)(1); see also Brewer, 1996 WL 147722, at *13 (applying the preponderance of the evidence standard to elements of compensation).

### A.    Pain and Suffering

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." § 15(a)(4).

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress. I.D. v. Sec'y of Health & Hum. Servs., No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula."); Stansfield v. Sec'y of Health & Hum. Servs., No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("[T]he assessment of pain and suffering is inherently a subjective evaluation."). Factors to be considered when determining an award for pain and suffering include: (i) awareness of the injury; (ii) severity of the injury; and (iii) duration of the suffering. I.D., 2013 WL 2448125, at *9 (quoting McAllister v. Sec'y of Health & Hum. Servs., No. 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), vacated & remanded on other grounds, 70 F.3d 1240 (Fed. Cir. 1995)).

The undersigned may look to prior pain and suffering awards to aid in the resolution of the appropriate amount of compensation for pain and suffering in this case. See, e.g., Doe 34 v. Sec'y of Health & Hum. Servs., 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case"). The undersigned may also rely on her experience adjudicating similar claims. Hodges v. Sec'y of Health & Hum. Servs., 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum. See Graves, 109 Fed. Cl. at 581.

In Graves, Judge Merow rejected the special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap. Graves, 109 Fed. Cl. at 589-90. Judge Merow noted that this constituted "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." Id. Instead, Judge Merow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. Id. at 595.

In determining an award for pain and suffering and emotional distress, it is appropriate to consider the severity of the injury, awareness of the injury, and duration of the suffering. Here, there is no dispute regarding awareness of the injury. Petitioner was fully aware of his ITP and its relevant sequelae.

Regarding severity, the undersigned's review of the records, affidavits, and declarations, the evidence supports a finding that Petitioner's ITP caused bruising, nosebleeds, petechiae, low platelet counts, resulted in limitations on Petitioner's activities, and required hospitalizations and

frequent visits to physicians, diagnostic and laboratory testing, monitoring, and various treatments including surgery to remove his spleen.

Medical records document that Petitioner had bruising, nosebleeds, and petechiae due to his ITP on multiple occasions between January 2015 and October 2017. Additionally, his medical records document that Petitioner experienced pain in his thighs, lower legs, and ankles over a two-to-three-month period. Further, in his affidavit, Petitioner explained that his nose bleeds were "extreme," and Petitioner recalled that he was "tired" a lot which led to him struggling in school. Pet. Ex. 71 at ¶¶ 8, 11.

Prior to his ITP diagnosis, Petitioner was very active and involved in wrestling. As his mother's affidavit noted, Petitioner qualified to attend the state tournament in wrestling. Petitioner explained he also enjoyed skateboarding, snowboarding, and riding ATVs.

Medical records document that in January 2015, Petitioner was ordered to refrain from wrestling, contact sports, and participation in gym class. On February 11, 2015, Dr. Fargo directed Petitioner to "[a]void any situation or activity where [he] could get bruised or hit. Absolutely NO contact sports." Pet. Ex. 1 at 42. In March 2015, Petitioner was advised he could resume gym but was directed to avoid contact supports and high risk activities such as skateboarding and ATV riding. Between March 2015 and June 2016, Dr. Pettee continued to direct Petitioner to avoid contact sports and high-risk activities. Petitioner was cleared to resume basketball on November 4, 2016; however, on December 5, 2016, Petitioner was advised by Dr. Savelli to avoid contact sports. Medical records note that Petitioner was playing baseball in June and July 2016 and playing basketball in December of 2016. Dr. Pettee did not place activity restrictions on Petitioner at his April, May, or June 2017 visits. However, at a September 2017 visit with Dr. Cook, Petitioner reported he was not participating in any sports due to his ITP. Petitioner was cleared to resume contact sports following his splenectomy, and on January 15, 2018, Petitioner reported to Dr. Pettee that he had resumed wrestling.

The medical records and Petitioner's affidavit support that Petitioner was directed to limit or stop activities due to his ITP. While he did resume playing basketball and baseball in the later half of 2016, the visit to Dr. Cook demonstrates that Petitioner again stopped activities in 2017 due to his ITP. Petitioner further explained that the limitations on playing sports negatively impacted his relationships with his peers.

Between diagnosis in January 2015 and his 2017 splenectomy, Petitioner had low platelet counts with the low platelet counts fluctuating between 6 and 93 x $10^9$/L. In January 2015, Petitioner was hospitalized for three days to due to his "low panic" platelet level. Pet. Ex. 1 at 27, 29. At appointments in March and July 2015, Petitioner's platelets were noted to be low but stable. Dr. Pettee noted that treatment was not needed for platelet counts above 40. On April 5, 2017, Petitioner's platelet counts fell to 14. After beginning steroid treatment, platelets rose to 93 on April 10, 2017. Petitioner's platelet counts fell to 17 on May 15, 2017. Platelet counts continued to rise and fall with treatment between May 2017 and Petitioner's splenectomy in October 2017. In October 2017, before the October 25, 2017 splenectomy, Petitioner's platelet counts fluctuated between 210 (normal) and 28 (low). After the October 25, 2017 splenectomy,

Petitioner's platelet count returned to normal levels and has remained in the normal range to the present.

Petitioner underwent frequent laboratory and diagnostic tests. For example, in 2015, Petitioner had 16 CBC tests to monitor platelet levels. Between 2016 and 2017, Petitioner continued to require near monthly monitoring of his platelet levels. Petitioner also required a bone marrow biopsy and aspiration for diagnostic purposes. This procedure required sedation of Petitioner. During this period, Petitioner made frequent visits to his pediatric hematologist and consulted with two rheumatologists on the advice of his hematologist.

Treatment for ITP included dexamethasone pulses (steroids), IVIG, WhinRo, and eltrombopag. Medical records note that Petitioner's second IVIG infusion caused nausea and rigors which required further treatment with Zofran and pain medications. Petitioner had side effects from his steroid treatment as well. Dr. Pettee noted that Petitioner was "somewhat steroid resistant" and diagnosed him with steroid side effects. Pet. Ex. 1 at 106. In his affidavit, Petitioner recalled that IVIG treatments took eight hours and would cause him to miss school. Additionally, his medications caused nausea and vomiting and steroid treatments caused him to gain weight.

The above medications were ineffective in managing Petitioner's ITP and he opted to treat his ITP with a splenectomy. The splenectomy was performed under general anesthesia and Petitioner was hospitalized for four days due to the procedure. Petitioner recalled that the surgery caused him to miss two weeks of school and he "fell more behind in school." Pet. Ex. 71 at ¶ 13.

Finally, Petitioner's affidavit explained that his initial hospitalization, that occurred when he was 10 years old, was "very scary" and confusing. Pet. Ex. 71 at ¶¶ 4-5, 8. The limitations on activity, isolation from his friends, and weight gain from medication was emotionally difficult for Petitioner. Further, following his splenectomy, Petitioner experienced anxiety and worry over the possibility of infection or ITP relapse.

As for duration, the undersigned finds that Petitioner experienced the most severe phase of his ITP from 2015 to 2017, when his platelet counts were erratic and his illness was refractory. On June 1, 2016, Petitioner's diagnosis was changed to chronic ITP. While he became asymptomatic and had normal platelet counts following splenectomy, his diagnosis has remained chronic ITP. Petitioner continues to be monitored by a hematologist for his chronic ITP with yearly visits and yearly monitoring of platelet levels. Due to his splenectomy, Petitioner has taken twice daily penicillin from October to the present.

Respondent notes that there are a dearth of reasoned decisions addressing pain and suffering concerning comparable ITP or splenectomy. Resp. Br. at 10. Accordingly, Respondent cites to Johnson, a Guillain-Barré syndrome case in which the petitioner was awarded $180,000.00 in actual pain and suffering. Johnson v. Sec'y of Health & Hum. Servs., No. 16-1356V, 2018 WL 5024012 (Fed. Cl. Spec. Mstr. July 20, 2018). However, the undersigned recently addressed pain and suffering in an ITP case in Mitchell and finds Mitchell

to be instructive to the present case. Mitchell v. Sec'y of Health & Hum. Servs., No. 19-1534V, 2025 WL 906798 (Fed. Cl. Spec. Mstr. Feb. 26, 2025).

In Mitchell, the undersigned awarded $180,000.00 in pain and suffering damages to an adult petitioner with chronic ITP. Mitchell, 2025 WL 906798, at *19. The undersigned made this award based on the petitioner's severe and refractory ITP for two years, followed by continued treatment for ITP two additional years until the petitioner's ITP went into remission. Id. at *16. In Mitchell, the petitioner required steroid treatments as well as IVIG infusions and one hospitalization. Id. at *14. Her steroid treatments caused her to gain weight. Id. Additionally, she was diagnosed with and treated for anxiety. Id. She had ongoing anxiety and distress related to the threat of and worry about relapse. Id. at *16. Unlike the present case, the petitioner's platelet level remained low after she went into remission. Id. at *15.

Similar to Mitchell, Petitioner has had his severe course of ITP for approximately three years. He required steroid treatments, multiple IVIG infusions and hospitalizations, as well as a bone marrow biopsy. While Petitioner was not diagnosed or treated for anxiety, his affidavit demonstrates he has an ongoing fear of ITP remission as well as a fear of infection due to splenectomy. There are additional facts in the present case that support a higher award than Mitchell. Namely, Petitioner was child at the onset of his illness, and he required a splenectomy.

For all of these reasons, the undersigned awards $250,000.00 for Petitioner's past pain and suffering.[54] This award acknowledges the severity and refractory nature of his illness for two years, the treatments that his ITP required, Petitioner's splenectomy and subsequent need for prophylactic medication and platelet monitoring, the impact of his disease on his preferred activities and education, and the emotional distress he has experienced since the onset of his illness.

In determining an award in this case, the undersigned does not rely on a single decision or case. Rather, the undersigned has reviewed the particular facts and circumstances in this case, giving due consideration to the circumstances and damages in other cases cited by the parties and other relevant cases, as well as her knowledge and experience adjudicating similar cases.

**B.     Lost Wages**

The Vaccine Program provides for an award of actual and anticipated lost earnings but distinguishes between adults and children based on the age at time of injury.

In the case of an injured adult, both actual and anticipated lost earnings are available, and the statute does not establish a particular formula by which to calculate them. See § 15(a)(3)(A). For an injured child, however, only anticipated lost earnings are available. The statute establishes an objective formula based on national averages by which to calculate anticipated lost earnings in the absence of claimant-specific work and earnings history:

---

[54] Due to the undersigned's finding that Petitioner's past pain and suffering exceeds the statutory maximum, it is unnecessary to consider Petitioner's future pain and suffering.

> In the case of any person who has sustained a vaccine-related injury before attaining the age of 18 and whose earning capacity is or has been impaired by reason of such person's vaccine-related injury for which compensation is to be awarded and whose vaccine-related injury is of sufficient severity to permit reasonable anticipation that such person is likely to suffer impaired earning capacity at age 18 and beyond, compensation after attaining the age of 18 for loss of earnings is determined on the basis of the average gross weekly earnings of workers in the private, non-farm sector, less appropriate taxes and the average cost of a health insurance policy, as determined by the Secretary.

§ 15(a)(3)(B). Petitioner was a child when he received the vaccination at issue and developed ITP. Accordingly, his claim for lost wages is governed by § 15(a)(3)(B).

Whether a petitioner's earning capacity is or has been impaired due to his vaccine injury and is reasonably anticipated to be impaired due to the severity of the vaccine injury is a threshold issue in awarding anticipated lost wages for children injured by a vaccine. Holihan v. Sec'y of Health & Hum. Servs., No. 95-399V, 1999 WL 63954, at *2 (Fed. Cl. Spec. Mstr. Jan. 19, 1999), rev'd on other grounds, 45 Fed. Cl. 201 (1999) (addressing impaired earning capacity as the "initial factual issue" in child's lost earnings claim); see also Brewer, 1996 WL 147722, at *24. Factual determinations on earning capacity impairment "often turn on the opinion of an expert." Holihan, 1999 WL 63954, at *2.

"If the court concludes that a minor is indeed suffering a vaccine-related injury, which impairs his . . . earning capacity, and the minor's earning capacity is likely to remain impaired at age 18 and beyond, the court awards an amount 'determined on the basis of the average gross weekly earnings of workers in the private, non-farm sector.'" Tembenis v. Sec'y of Health & Hum. Servs., 733 F.3d 1190, 1194 (Fed. Cir. 2013). However, a petitioner is entitled to compensation for lost earnings under § 15(a)(3)(B) only when the petitioner is not capable of earning the average gross weekly earnings of workers in the private, non-farm sector. Holihan, 45 Fed. Cl. at 205-07; see also Brown v. Sec'y of Health & Hum. Servs., No. 88-24V, 1989 WL 250117, at *7 (Fed. Cl. Spec. Mstr. Sept. 13, 1989), rev'd in part on other grounds, 920 F.2d 918 (Fed. Cir. 1990) (finding a petitioner ineligible for lost earning award under § 15(a)(3)(B) as the petitioner could not establish she was unable to earn less than the average gross weekly earnings of workers in the private non-farm).

Case law addressing anticipated lost earnings in adults rejects compensation for anticipated loss of earnings that is based on speculation. J.T. v. Sec'y of Health & Hum. Servs., No. 12-618V, 2015 WL 5954352, at *7 (Fed. Cl. Spec. Mstr. Sept. 17, 2015) (noting § 15(a)(3)(A) "does not envision that 'anticipated loss of earnings' includes speculation"), mot. for rev. den'd, 125 Fed. Cl. 164 (2016). Furthermore, speculation around planned future endeavors should not be used in determining a petitioner's claim of future lost wages. J.T., 2015 WL 5954352, at *7, *10-12 (denying speculative future lost wages based on petitioner's claim that his vaccine injury prevented him from starting a new professional endeavor he planned to undertake). For child claimants, determinations for lost wages should be based on the general work life expectancy of an uninjured individual, not the petitioner's expectancy. Brewer, 1996

WL 147722, at *25 (citing <u>Edgar v. Sec'y Health & Hum. Servs.</u>, 989 F.2d 473 (Fed. Cir. 1993)).

Failure to provide preponderant evidence to support a finding that a petitioner's earning capacity has been impaired because of a vaccine injury will result in denial of a lost wage claim. <u>See, e.g.</u>, <u>Dillenbeck v. Sec'y of Health & Hum. Servs.</u>, No. 17-428V, 2019 WL 4072069, at *12-13 (Fed. Cl. Spec. Mstr. July 29, 2019), <u>mot. for review den'd</u>, 147 Fed. Cl. 131 (2020).

In the present case, the undersigned finds Petitioner has not provided preponderant evidence that his earning capacity "has been impaired" or that his injury "is of sufficient severity to permit reasonable anticipation that [he] is likely to suffer impaired earning capacity." § 15(a)(3)(B). While Petitioner is subject to narrow limitations on the types of jobs he should perform, he has not demonstrated that these limitations have impaired his earning capacity, nor has he provided other evidence of impaired earning capacity.

The undersigned finds that that Petitioner has some reasonable limitations on the kinds of employment he should undertake based on the testimony of Dr. Strouse and Dr. Forman. Namely, Petitioner should not take on employment that would prevent him from accessing emergency care within one to two days such as forestry service, wilderness guide, or commercial fishing. Additionally, Petitioner is unable to join the military.

The undersigned does not find that Petitioner is precluded from sedentary jobs (desk jobs) due to his splenectomy and ITP. Respondent's expert, Dr. Strouse, testified that he did not place limitations on office jobs as movement during the day such as walking to a desk or bathroom was sufficient to reduce the risk of thrombosis. While Petitioner's expert, Dr. Forman, asserted Petitioner should avoid sedentary jobs, Dr. Forman could not recall placing any such employment limitations on his own post-splenectomy patients. Further, Dr. Forman did not provide relevant medical literature or other evidence addressing the risk of thrombosis for asplenic patients in sedentary positions.

Further, Petitioner has not established that he should avoid employment as a firefighter, police officer, in healthcare settings, or in sites with high crowding. While Dr. Forman suggested these limitations on employment, he did not provide medical literature or other evidence in support of these limitations. And he testified that he could not recall placing any employment limitations on his own post-splenectomy patients. Dr. Strouse did not recommend these employment limitations and stated that he was aware of asplenic patients working in health care settings and was unaware on any restrictions placed on joining the police or firefighters based on splenectomy.

Moreover, the undersigned finds that Dr. Forman's statements on employment limitations to be speculative and/or conclusory in nature. When evaluating whether petitioners have carried their burden of proof, special masters consistently reject "conclusory expert statements that are not themselves backed up with reliable scientific support." <u>Kreizenbeck v. Sec'y of Health & Hum. Servs.</u>, No. 08-209V, 2018 WL 3679843, at *31 (Fed. Cl. Spec. Mstr. June 22, 2018), <u>mot. for rev. den'd, decision aff'd</u>, 141 Fed. Cl. 138 (2018), <u>aff'd</u>, 945 F.3d 1362 (Fed. Cir. 2020). Special masters are expected to carefully scrutinize the reliability of each expert report

submitted. Prokopeas v. Sec'y of Health & Hum. Servs., No. 04-1717V, 2019 WL 2509626, at *19 (Fed. Cl. Spec. Mstr. May 24, 2019) (quoting Moberly v. Sec'y of Health & Hum. Servs., 592 F.3d 1315, 1315 (Fed. Cir. 2010)). The undersigned will not rely on "opinion evidence that is connected to existing data only by the ipse dixit of the expert." Id.

While Ms. Kattman reported that Dr. Pettee advised her Petitioner should avoid professional sports and work that puts Petitioner at risk of head or abdomen injury, the undersigned gives little weight to these specific limitations as well as they are conclusory and inconsistent with the contemporaneous medical records.

Treating physician statements are typically "favored." Capizzano v. Sec'y of Health & Hum. Servs., 440 F.3d 1317, 1326 (Fed. Cir. 2006) (quoting Althen v. Sec'y of Health & Hum. Servs., 418 F.3d 1274, 1280 (Fed. Cir. 2005)). However, no treating physician's views bind the special master. § 13(b)(1). "As with expert testimony offered to establish a theory of causation, the opinions or diagnoses of treating physicians are only as trustworthy as the reasonableness of their suppositions or bases." Welch v. Sec'y of Health & Hum. Servs., No. 18-494V, 2019 WL 3494360, at *8 (Fed. Cl. Spec. Mstr. July 2, 2019).

Here, the reported limitations from Dr. Pettee are not supported by medical literature or other evidence. Further, these limitations do not appear in contemporaneous records of Petitioner's visits with Dr. Pettee, and Dr. Pettee does not address these limitations in his letter to Petitioner's employer. Finally, these limitations are inconsistent with the fact that Dr. Pettee lifted his previous limitations on contact sports and other high risk activities following Petitioner's splenectomy.

Next, Petitioner has not demonstrated that the above limitations on types of employment has or will impair his earning capacity. Petitioner's experts, Ms. Kattman and Dr. McNulty, opined that Petitioner has between a 20-25.5% earning capacity impairment. The undersigned does not find theses opinions persuasive as they are inconsistent with opinions of the hematology experts, who testified that Petitioner will be able to take full time employment.

Ms. Kattman's 20% earning capacity impairment is largely based on Petitioner's alleged employment limitations on sedentary work and limitations on employment involving interaction with the public. The undersigned finds, however, that Petitioner has not established that his splenectomy or ITP places these kinds of limitations on his employment opportunities.

Dr. McNulty calculated the 25.5% earning capacity impairment based on his assessment that Petitioner had a "work disability" and fit within criterion one of the work disability criteria set forth by the BLS/Census. There are several issues with Dr. McNulty's approach.

First, while Dr. McNulty asserts that he relied on the limitations identified by Dr. Forman and Ms. Kattman in concluding that Petitioner had a work disability, Petitioner has not established many of limitations set forth by Dr. Forman and Ms. Kattman. Additionally, both Dr. Forman and Dr. Strouse opined that Petitioner is capable of working full time at 40 hours a week for 50 weeks a year. Further, Dr. Forman opined that Petitioner was not physically or intellectually disabled. Instead, Dr. Forman opined that Petitioner had a risk of disability.

However, Dr. Forman was unable to quantify or provide further details on how this risk of disability would impact Petitioner's earning capacity. Additionally, both Dr. Strouse and Dr. Forman testified that they were unaware of reputable data or information showing that otherwise healthy young adults with splenectomy had a reduced earning capacity.

Next, Dr. McNulty asserted that Petitioner fit within criterion one of the work disability criteria set forth by the BLS/Census. Criterion one contemplates "[i]ndividuals who have a health problem or disability which prevents them from working or limits the kind or amount of work they can do." Pet. Ex. 66 at 3. However, as BLS/Census explicitly note, the BLS/Census work disability criteria "were not designed with the intent of measuring disability, and thus the reliability and validity of the estimates generated from these questions is unknown. The questions were not placed in the CPS to measure disability, but rather, to achieve other goals." Resp. Ex. D at 3-4. Criterion one is broad and not limited to individuals like Petitioner with narrow limitations on what type of work to perform nor is it designed to measure the degree of individual disability. Accordingly, it has limited value for determining the degree of disability or impairment in an individual like Petitioner.

The opinions of the testifying physicians and the BLS/Census data do not provide underlying support for Dr. McNulty's conclusion that Petitioner has a 25.5% earning capacity impairment. The undersigned will not rely on an expert statement that lacks such support. See Kreizenbeck, 2018 WL 3679843, at *31.

Finally, Petitioner argues that his employment plans and projected earning as a barber provide direct evidence that Petitioner's earning capacity has been impaired due to his ITP and splenectomy. Petitioner asserts that he is training as a barber due to the limitations placed on his employment by his splenectomy.

In his affidavit, Petitioner contends that the splenectomy required him to leave his battery factory job on the advice of his doctor due to an increased risk of pneumonia. However, Petitioner's medical records show that his treating hematologist "was not aware of any increased risk for pneumonia" in asplenic patients "due to industrial agents." Pet. Ex. 70 at 75. Instead, Dr. Pettee only noted it "may be prudent to modify Petitioner's work environment as a precaution." Id. In his letter, Dr. Pettee does not advise that Petitioner leave his battery factory job due to an increased risk of pneumonia. There are no additional medical records from Dr. Pettee advising Petitioner on job limitations. Petitioner's primary care providers explicitly deferred to the expertise of a hematologist regarding the impact of Petitioner's splenectomy on his battery factory position. Additionally, neither of the testifying physicians identified factory or manufacturing jobs with exposure to industrial jobs as the type of job that would be limited by splenectomy. And the medical literature does not identify an increased risk of pneumonia due to industrial exposure in asplenic patients.

Further, Petitioner's contemporaneous medical records do not show that Dr. Pettee, or any other treating provider, placed limitations on Petitioner's work or activities post-splenectomy. Rather, following his splenectomy, Petitioner was permitted by both Dr. Pettee and his surgeon to resume contact sports. Additionally, Dr. Pettee documented Petitioner's employment plans in his visit summaries, documenting at his 2020 visit that Petitioner was

"[t]hinking about his future options (electrician vs college)," noting at his 2022 visit that Petitioner was interested in trade school or an electrician career, and, in 2023, noting that Petitioner was attending barber school. Pet. Ex. 10 at 87; Pet. Ex. 79 at 145, 232. The contemporaneous records from these visits do not place any limitations on the types of employment Petitioner could undertake.

For the above reasons and based on the contemporaneous medical records as well as the opinions of Dr. Strouse and Dr. Forman, the undersigned finds that Petitioner has not provided preponderant evidence that his earning capacity is impaired or that he is likely to suffer impaired earnings capacity. Accordingly, Petitioner is not entitled to award of lost wages.

The impairment of earning capacity is a threshold issue for determining a lost earnings award. Accordingly, the undersigned does not make any findings as to whether Petitioner can or will earn the average gross weekly earnings of workers in the private, non-farm sector. She notes, however, that both testifying physicians opined that Petitioner is capable of working a full-time job. Further, Petitioner has no intellectual or mentally disability by virtue of his vaccine injury or any other underlying condition. Finally, the record demonstrates that Petitioner considered attending college with offers to join a college wrestling program after high school and considered attending electrician trade school prior to beginning his training to become a barber like his father.

## C.    Unreimbursable Expenses

Compensation awarded pursuant to the Vaccine Act shall also include "[a]ctual unreimbursable expenses incurred from the date of the judgment awarding such expenses and reasonable projected unreimbursable expenses" that

(i)     result from the vaccine-related injury for which the [P]etitioner seeks compensation,

(ii)    have been or will be incurred by or on behalf of the person who suffered such injury, and

(iii)   (I) have been or will be for diagnosis and medical or other remedial care determined to be reasonably necessary, or
(II) have been or will be for rehabilitation, developmental evaluation, special education, vocational training and placement, case management services, counseling, emotional or behavioral therapy, residential and custodial care and service expenses, special equipment, related travel expenses, and facilities determined to be reasonably necessary.

§ 15(a)(1)(A).

"[R]easonable projected unreimbursable expenses" must be shown to be "reasonably necessary." § 15(a)(1)(A)(iii). "Special masters have characterized this phrase as a 'vague instruction' and a standard for which there is 'no precise' definition." Lerwick ex rel. B.L. v. Sec'y of Health & Hum. Servs., No. 06-847V, 2014 WL 3720309, at *5 (Fed. Cl. Spec. Mstr. June 30, 2014); see also I.D., 2013 WL 2448125, at *6 (defining "reasonably necessary" to mean

"that which is required to meet the basic needs of the injured person . . . but short of that which may be required to optimize the injured person's quality of life" (quoting Scheinfield v. Sec'y of Health & Hum. Servs., No. 90-212V, 1991 WL 94360, at *2 (Cl. Ct. Spec. Mstr. May 20, 1991))); Bedell v. Sec'y of Health & Hum. Servs., No. 90-765V, 1992 WL 266285 (Cl. Ct. Spec. Mstr. Sept. 18, 1992) (defining "reasonably necessary" to mean "more than merely barely adequate, but less than the most optimal imaginable"); Alonzo v. Sec'y of Health & Hum. Servs., No. 18-1157V, 2023 WL 5846682, at *11 (Fed. Cl. Spec. Mstr. Aug. 14, 2023).

Health insurance costs are a permissible unreimbursed expense.[55] Huber, 22 Cl. Ct. at 257. "It is within the discretion of the Special Master to determine that health insurance premiums are 'reasonably necessary' for medical care." Ginn v. Sec'y of Health & Hum. Servs., No. 16-1466V, 2022 WL 17331337, at *8 (Fed. Cl. Spec. Mstr. Nov. 4, 2022).

In Huber, Judge Wiese held that "health insurance premiums [were] a permissible item of compensation where the insurance can help cover those medical risks for which compensation would otherwise be allowable under the Act and where the insurance is, in fact, a lower-cost alternative to the funding of those risks." Huber, 22 Cl. Ct. at 257. Judge Wiese concluded that "the allowance of insurance costs meeting these requirements grants no more than the statute permits and therefore cannot be regarded as an impermissible enlargement of the Act." Id. Judge Wiese explained, "the compensability of the expense is to be evaluated in light of the injury it seeks to redress." Id. While the case was remanded back to the special master to address several issues, Judge Wiese recognized that the cost of health insurance could be an appropriate way to address the funding of medical risks—a concept applicable to the case at hand. Id.

Based on the testimony of Drs. Forman and Strouse, and medical records, the medical literature, and other expert reports, as well as the facts and circumstances specific to this case, the undersigned finds that health insurance costs (including premiums and individual maximum out of pocket) are reasonably necessary due to Petitioner's vaccine-related injury.

First, the undersigned notes that both parties' hematology experts agree Petitioner requires emergency medical care when he has a fever due to his splenectomy. Due to the risk of OPSI in asplenic individuals, Petitioner requires rapid evaluation of certain infections should he become febrile and must present to an ED for rapid evaluation, tests, and antibiotics only available in an ED and hospital setting. Of note, Petitioner's treating hematologist, Dr. Pettee, provided this same guidance to Petitioner. Dr. Strouse opined that Petitioner will have a fever once every 10 years while Dr. Forman estimated that Petitioner will have two to four infections a year, with one involving a fever.

---

[55] Health insurance premiums and maximum out of pockets have previously been awarded in proffers of damages and in damages decisions. See, e.g., Tracy ex rel. R.S. v. Sec'y of Health & Hum. Servs., No. 16-213, 2025 WL 573426 (Fed. Cl. Spec. Mstr. Jan. 15, 2025); Eilan ex rel. E.A. v. Sec'y of Health & Hum. Servs., No. 15-381V, 2025 WL 1091829 (Fed. Cl. Spec. Mstr. Mar. 19, 2025); DeLozier ex rel. L.T. v. Sec'y of Health & Hum. Servs., No. 15-124V, 2022 WL 4281717 (Fed. Cl. Spec. Mstr. Aug. 22, 2022).

The undersigned acknowledges that it is unlikely that any individual fever that Petitioner is evaluated for will result in OPSI and that the lifetime risk of Petitioner developing OPSI is less than 10%. This does not negate the need for Petitioner's fevers to be evaluated rapidly and appropriately treated. Further this need is not addressed, as suggested by Respondent's life care planner, by providing two additional primary care visits each year because a hospital emergency room is the only appropriate place to receive the rapid evaluation needed by asplenic individuals like Petitioner.

Further, Dr. Strouse noted that Petitioner needs continued monitoring for recurrence of ITP which not only includes an annual CBC but also required "emergency evaluation of any signs and symptoms" concerning for ITP relapse. Resp. Ex. C at 4.

Respondent asserts that Petitioner has not established a "reasonable likelihood" of an emergency occurrence that will result in substantial additional medical costs that are related to his vaccine injury. Resp. LCP Br. at 4-5. This argument ignores Petitioner's expert opinion that Petitioner will require emergency care once per year and Respondent's expert's opinion that Petitioner will require emergency care, if only once every 10 years. In sum, both experts agree that emergency medical care will be required for a workup of fever, although they disagree as to the frequency of that care. Petitioner's vocational expert calculated the base cost of a single trip to the ED as between $2,000.00 and $8,000.00.

Moreover, Petitioner also has additional risks due to his splenectomy and ITP. The experts agree that these risks exist, and Petitioner has been directed to monitor for the risk of OPSI and receive yearly monitoring for a recurrence of ITP. While rare, the risk of ITP recurrence and OPSI are known and identifiable medical risks to Petitioner. Of note, both Dr. Forman and Dr. Strouse testified that Petitioner requires health insurance coverage due to risks from his splenectomy and ITP. Tr. 24 ("[Petitioner] needs excellent coverage . . . because he has so many risks."); Tr. 61 (agreeing that Petitioner needs "whatever is necessary for him to have good access to healthcare" due to ITP and splenectomy).

In Ginn, the undersigned determined that health insurance was the most reasonable way to address rare but known complications of a vaccine injury. Ginn, 2022 WL 17331337, at *7-8. Also in Ginn, Respondent did not provide a "line item" for the actual cost of "known risk factors or future contingencies." Id. at *8. Here, Petitioner has provided projected actual costs as low as $2,203.00 for a single visit to the ED and actual costs up to $91,039.00 for hospitalization due to ITP recurrence. While Respondent disputes probable need of these costs, he does not dispute the projected amounts.

In the present case, the parties' experts agree that Petitioner will require rapid diagnostic workup at an ED or hospital setting when he has a significant fever. Petitioner's treating hematologist explained "[Petitioner] will need to be admitted to hospital for 24-48 hours for sepsis evaluation for ANY fever 101 or higher." Pet. Ex. 1 at 137. Therefore, the undersigned finds that the costs of medical care for the necessary ED or hospital admission for assessment of fever are reasonably necessary and a compensable cost under the Act.

Petitioner projects the base cost of ED visit as between $2,203.00 and $8,011.00 per visit for professional fees, facility fees and diagnostic tests such as rapid sepsis test, rapid pneumonia test, CBC panels and metabolic panels, with additional costs for medications such IV antibiotics and consultations. If Petitioner then requires hospitalization for infection, such as pneumonia or sepsis, a three-to-six-day hospitalization is projected to cost between $24,726.00 and $86,000.00.[56] Given the very high costs of emergency and hospital care, one cannot conclude that the actual costs of required care will be less than the cost of health insurance.

The question here is how often this care will be required, so that the costs can be projected. The experts, however, disagree on this point. Dr. Forman opined Petitioner will have two to four infections a year with one of these infections involving a fever while Dr. Strouse opined that Petitioner will have a fever once every 10 years. Due to this dispute, the actual annual costs cannot be projected. While the medical care is reasonably necessary, the costs are not quantifiable. Therefore, the most reasonable way to cover costs that could range from low to very high, depending on how often the care is required, is to award health insurance.

Relying on Neher, Respondent argues that providing health insurance premiums and deductibles is the type of contingency funding unavailable under the Act. Neher, 984 F.2d at 1199. In Neher, the Federal Circuit determined that that lump sum payment to "deal with minor changes not accounted for" was impermissible as the lump sum award could "only refer to possible expenses that cannot be reasonably projected." Id. at 1999. Here, health insurance is not a one-time lump sum payment to fund "minor changes not accounted for." Id. Rather, health insurance is reasonable approach addressing the cost of Petitioner's known risks attendant to Petitioner's vaccine related injury of splenectomy and ITP.

Finally, health insurance has previously been awarded in circumstances where a petitioner will lose Medicaid coverage due to a Vaccine Act award. Ginn, 2022 WL 17331337, at *8; see also La Veck ex rel. O.B. v. Sec'y of Health & Hum. Servs., No. 14-340V, 2015 WL 9194841, at *2, *4 (Fed. Cl. Spec. Mstr. Sept. 11, 2015) (proffering health insurance premiums, but not lost earnings, when the minor vaccinee lost Medicaid but would "more likely than not be gainfully employed in the future"). In Ginn, the undersigned based her award health insurance award, in part, on the fact that the petitioner did not have health insurance available through his parent's employment. Ginn, 2022 WL 17331337, at *5 (noting lack of health insurance access was "foundational" to the award of insurance).

Here, Petitioner has health insurance coverage through Medicaid. Although Petitioner is under 26, he is unable to access health insurance through his parents' employment. Petitioner's mother does not have health insurance through her employer due to the cost. Petitioner's father owns his own barber shop and does not carry insurance due to the cost. Instead, the parents have coverage through Medicaid. Finally, Petitioner is unlikely to be able to access insurance coverage through his own employment plans as he will be working at his father's barber shop. Accordingly, if Petitioner loses Medicaid coverage due to his vaccine award, he will not be able to access other health insurance coverage through his parents' employers or thorough his own

---

[56] Any hospitalization required for ITP recurrence is projected to cost between $63,711.00 and $91,039.00.

employment plans. These facts and circumstances provide further support for an award of health insurance.

It is within the discretion of the Special Master to determine that health insurance coverage is "reasonably necessary" for medical care. Based on the above, the undersigned finds health insurance premiums and the individual maximum out of pocket are reasonably necessary for Petitioner. Having determined that Petitioner is entitled to such coverage, the undersigned must determine the appropriate health insurance plan.

The undersigned finds the UHC Gold Advantage plan appropriate for several reasons. First, it has lower out of pocket maximum than Ambetter Buckeye Health. It also has a lower copay for Petitioner's daily penicillin ($3.00 compared to $15.00). Importantly, UHC Gold advantage has an A+ credit rating and Respondent did not provide a credit rating for his proposed Ambetter Buckeye Health plan.

Finally, Respondent argues that any insurance premiums awarded by the undersigned should be offset by the ACA advanced premium tax credit that Petitioner qualifies for based on his projected income of $35,390.00. However, the future of these subsidies is uncertain. Recent legislation[57] shows that such subsidy may no longer be available to Petitioner. Therefore, the undersigned does not find it appropriate to offset the cost of premiums by the ACA advanced premium tax credit.

Accordingly, the undersigned awards health insurance in the form of UHC Gold Advantage plan premiums and the individual maximum out of pocket for the years 2025 through 2068, when Petitioner reaches the age of 65.

## VII.  CONCLUSION

In determining an award in this case, the undersigned does not rely on a single decision or case. Rather, the undersigned has reviewed the particular facts and circumstances in this case, giving due consideration to the circumstances and damages in other cases cited by the parties and other relevant cases, as well as her knowledge and experience adjudicating similar cases.

In light of the above analysis, and in consideration of the record as a whole, the undersigned finds that Petitioner should be awarded (1) $250,000.00 for pain and suffering and (2) and an amount sufficient to fund the life care plan items agreed upon by the parties as well as the health insurance premium and maximum out of pocket cost set forth in Petitioner's plan awarded herein.

The parties are to file a joint status report within 30 days, **by Monday, August 18, 2025**, (1) providing a complete and final life care plan incorporating the items adjudicated herein, (2) confirming that Respondent has arranged for an annuity to fund the life care plan and health

---

[57] The availability of the advanced premium tax credit has been impacted by recent legislation which has reduced or eliminated the availability of income-based ACA premium subsidies. See Omnibus Big Beautiful Bill Act, Pub. L. No. 199-21, § 71304, 139 Stat. 72 (2025).

insurance, (3) providing a summary of the award of compensation incorporating the parties agreed upon items and the undersigned award herein, and (4) confirming that all items of damages have now been resolved and that no issues remain outstanding.

Thereafter, a damages decision will issue.

**IT IS SO ORDERED.**

**<u>s/Nora Beth Dorsey</u>**
Nora Beth Dorsey
Special Master

**Appendix A - Petitioner's Exhibit 81**

| | |
|---|---|
| NAME: | Jacob Robert Ferguson |
| DATE OF BIRTH: | 03-03-04 |
| PETITIONER'S PLANNER: | Elizabeth Kattman, M.S., CRC, CLCP |
| RESPONDENT'S PLANNER: | M. Virginia Walton, M.S.N., RN, FNP, CNLCP |
| DATE: | 11-15-24 |

### Comparison of Proposed Health Insurance 2025

| Petitioner's Proposed ACA Health Plan | Respondent's Proposed ACA Health Plan |
|---|---|
| UHC Gold Advantage (zip code 44511) | Ambetter from Buckeye Health – Clear Gold Plan |
| Individual Deductible $500.00 (health and drug combined)<br>Individual Maximum Out of Pocket $7,000.00 | Individual deductible $900.00<br>Individual Maximum Out of Pocket $8,400.00 |
| Primary Care Visits $10.00 copay (excluded from deductible)<br>Specialist Visits $75.00 copay (excluded from deductible) | Primary Care Visits $25.00 copay (excluded from deductible)<br>Specialist Visits $60.00 copay (excluded from deductible) |
| Urgent Care $50.00 copay (after deductible is met)<br>Emergency Care $500.00 copay (after deductible is met) | Urgent Care $60.00 copay (excluded from deductible)<br>Emergency Care 30% coinsurance (after deductible is met) |
| Generic Drugs, including Penicillin VK, $3.00 copay (excluded from deductible)<br>Diagnostic Testing $10.00 copay at free-standing locations (excluded from deductible) | Generic Drugs (Tier 1b – Penicillin VK) $15.00 copay (excluded from deductible)<br>Diagnostic Testing 30% coinsurance (after deductible is met) |
| Age-rated Full Price Premiums:<br>21, 22, 23, and 24 years (2025 thru 2028)<br>$467.61/ month; $5,611.32/year | Age-Rated Full Price Premiums :<br>21, 22, 23, and 24 years (2025 thru 2028)<br>$330.45/month;  $3,965.40/year |
| 25 years (2029)         $469.48/month; $5,633.76/year<br>26 years (2030)         $478.83/month; $5,745.96/year | 25 years (2029)         $331.76/month;  $3,981.12/year<br>26 years (2030)          338.37/month;   4,060.44/year |

### Exhibit 81

| | | | | |
|---|---|---|---|---|
| 27 years (2031) | $490.06/month; $5,880.72/year | 27 years (2031) | 346.30/month; | 4,155.60/year |
| 28 years (2032) | $508.29/month; $6,099.48/year | 28 years (2032) | 359.19/month; | 4,310.28/year |
| 29 years (2033) | $523.26/month; $6,279.12/year | 29 years (2033) | 369.76/month; | 4,437.12/year |
| 30 years (2034) | $530.74/month; $6,368.88/year | 30 years (2034) | 375.05/month; | 4,500.60/year |
| 31 years (2035) | $541.96/month; $6,503.52/year | 31 years (2035) | 382.98/month; | 4,595.76/year |
| 32 years (2036) | $553.18/month; $6,638.16/year | 32 years (2036) | 390.91/month; | 4,690.92/year |
| 33 years (2037) | $560.20 /month; $6,722.40/year | 33 years (2037) | 395.87/month; | 4,750.44/year |
| 34 years (2038) | $567.68/month; $6,812.16/year | 34 years (2038) | 401.16/month; | 4,813.92/year |
| 35 years (2039) | $571.42/month; $6,857.04/year | 35 years (2039) | 403.80/month; | 4,845.60/year |
| 36 years (2040) | $575.16/month; $6,901.92/year | 36 years (2040) | 406.44/month; | 4,877.28/year |
| 37 years (2041) | $578.90/month; $6,946.80/year | 37 years (2041) | 409.09/month; | 4,909.08/year |
| 38 years (2042) | $582.64/month; $6,991.68/year | 38 years (2042) | 411.73/month; | 4,940.76/year |
| 39 years (2043) | $590.13/month; $7,081.56/year | 39 years (2043) | 417.02/month; | 5,004.24/year |
| 40 years (2044) | $597.61/month; $7,171,32/year | 40 years (2044) | 422.30/month; | 5,067.60/year |
| 41 years (2045) | $608.83/month; $7,305.96/year | 41 years (2045) | 430.23/month; | 5,162.76/year |
| 42 years (2046) | $619.58/month; $7,434.96/year | 42 years (2046) | 437.83/month; | 5,253.96/year |
| 43 years (2047) | $634.55/month; $7,614.60/year | 43 years (2047) | 448.41/month; | 5,380.92/year |
| 44 years (2048) | $653.25/month; $7,839.00/year | 44 years (2048) | 461.63/month; | 5,539.56/year |
| 45 years (2049) | $675.23/month; $8,102.76/year | 45 years (2049) | 477.16/month; | 5,725.92/year |
| 46 years (2050) | $701.42/month; $8,417.04/year | 46 years (2050) | 495.66/month; | 5,947.92/year |
| 47 years (2051) | $730.88/month; $8,770.56/year | 47 years (2051) | 516.48/month; | 6,197.76/year |
| 48 years (2052) | $764.54/month; $9,174.48/year | 48 years (2052) | 540.27/month; | 6,483.24/year |
| 49 years (2053) | $797.74/month; $9,572.88/year | 49 years (2053) | 563.73/month; | 6,764.76/year |
| 50 years (2054) | $835.15/month; $10,021.80/year | 50 years (2054) | 590.17/month; | 7,082.04/year |
| 51 years (2055) | $872.09/month; $10,465.08/year | 51 years (2055) | 616.27/month; | 7,395.24/year |
| 52 years (2056) | $912.78/month; $10,953.36/year | 52 years (2056) | 645.02/month; | 7,740.24/year |
| 53 years (2057) | $953.93/month; $11,447.16/year | 53 years (2057) | 674.10/month; | 8,089.20/year |
| 54 years (2058) | $998.35/month; $11,980.20/year | 54 years (2058) | 705.49/month; | 8,465.88/year |
| 55 years (2059) | $1,042.77/month; $12,513.24/year | 55 years (2059) | 736.88/month; | 8,842.56/year |
| 56 years (2060) | $1,090.94/month; $13,091.28/year | 56 years (2060) | 770.92/month; | 9,251.04/year |
| 57 years (2061) | $1,139.57/month; $13,674.84/year | 57 years (2061) | 805.28/month; | 9,663.36/year |

2

Exhibit 81

| | | | | |
|---|---|---|---|---|
| 58 years (2062) | $1,191.47/month; $14,297.64/year | 58 years (2062) | 841.96/month; | 10,103.52/year |
| 59 years (2063) | $1,217.19/month; $14,606.28/year | 59 years (2063) | 860.14/month; | 10,321.68/year |
| 60 years (2064) | $1,269.10/month; $15,229.20/year | 60 years (2064) | 896.82/month; | 10,761.84/year |
| 61 years (2065) | $1,313.99/month; $15,767.88/year | 61 years (2065) | 928.54/month; | 11,142.48/year |
| 62 years (2066) | $1,343.45/month; $16,121.40/year | 62 years (2066) | 949.36/month; | 11,392.32/year |
| 63 years (2067) | $1,380.39/month; $16,564.68/year | 63 years (2067) | 975.46/month; | 11,705.52/year |
| 64 years (2068) | $1,402.83/month; $16,833.96/year | 64 years (2068) | 991.31/month; | 11,895.72/year |

Exhibit 81